LOCKE MANUFACTURING COM-
PANIES, Plaintiff,

v.

UNITED STATES of America,
Defendant.

Civ. No. 9122.

United States District Court
D. Connecticut.

Dec. 7, 1964.

William Reeves, of Pullman, Comley, Bradley & Reeves, Bridgeport, Conn., for plaintiff.

Thomas F. Field, Tax Division, Dept. of Justice, Washington, D. C. (Louis F. Oberdorfer, Asst. Atty. Gen., C. Moxley Featherston and David A. Wilson, Washington, D. C., F. Owen Eagan, U. S. Atty., Hartford, Conn. and Howard T. Owens, Jr., Asst. U. S. Atty., New Haven, Conn., on the brief), for defendant.

TIMBERS, Chief Judge.

### QUESTION PRESENTED

This action, tried to the Court without a jury, to recover $8,409.97 of federal corporate income taxes and assessed interest claimed to have been erroneously assessed and collected, raises the question whether portions of plaintiff's proxy solicitation and shareholder relation expenses incurred in a proxy contest during plaintiff's taxable year ending June 30, 1956 are deductible by plaintiff as ordinary and necessary expenses pursuant to Section 162(a) of the Internal Revenue Code of 1954.[1]

---

I. 26 U.S.C. § 162(a):
 "§ 162. Trade or business expenses
 (a) In general.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in car-

The Court holds that such expenses are deductible by plaintiff as ordinary and necessary expenses.[2]

## PRIOR PROCEEDINGS

Of the total expenses in amount of $34,411.73 [3] incurred by plaintiff in connection with the proxy contest which culminated in the meeting of plaintiff's stockholders December 6, 1955, the District Director allowed $20,317.56 ($10,840.55 of legal fees and $9,477.01 of public relations fees) to be deducted as ordinary and necessary expenses within the meaning of Section 162(a). He disallowed the balance of $14,094.17 ($5,312.00 of public relations fees and $8,782.17 of proxy solicitor's fees).

The disallowance of $14,094.17 resulted in a tax deficiency of $7,328.97, plus $1,081.00 of assessed interest. The total deficiency of $8,409.97 was paid by plaintiff March 2, 1959. A timely claim for refund was filed by plaintiff September 9, 1959 and was rejected January 7, 1960 by the District Director. The instant action was commenced January 4, 1962. The Court has jurisdiction pursuant to 28 U.S.C. § 1346(a) (1).

## PLAINTIFF'S BUSINESS AND PLANS FOR INDIANA CHAIN MANUFACTURING PLANT

Plaintiff is a Connecticut corporation with its principal place of business in Bridgeport.[4] It is on a June 30 fiscal year basis. During the period here involved, it had outstanding 110,000 shares of common stock with a par value of $5.00 per share, the holders of which were entitled to one vote per share. The stock was held by about 1000 stockholders; 13,700 shares were held by two stockholders; the remaining 96,300 shares were widely distributed throughout the country, the largest concentration of stockholders being in the New England area. The stock is registered with the Securities and Exchange Commission and is listed on the American Stock Exchange.

For many years plaintiff has been engaged in the manufacture of detachable steel sprocket chains and attachments used principally in the farm implement industry; it also is engaged in the manufacture and sale of power lawn mowers. Its chief customers are the recognized leaders in the farm implement manufacturing industry, including Allis-Chalmers, J. I. Case, Deere, Massey-Harris, Minneapolis-Moline, New Idea (Avco), Oliver, International Harvester and some 120 other equipment manufacturers and distributors, most of which are located in the mid-west.

For about a year prior to the spring of 1955, plaintiff had been planning either to move its chain manufacturing division

---

rying on any trade or business
* * *."

2. Defendant's counsel have informed the Court that this is a "case of first impression."
But defendant's counsel failed to inform the Court that they appear for defendant in a case which has been pending in the United States Court of Claims for more than four years in which there is presented substantially the same question as in the instant case, i. e. whether expenses incurred by a corporation in a proxy contest, including fees of professional proxy solicitors and public relations counsel, are deductible by the corporation as ordinary and necessary expenses for the calendar years 1956 and 1957 pursuant to Section 162(a) of the Internal Revenue Code of 1954. Fairbanks, Morse & Co. v. United States,

Nos. 314–60 and 386–61 (Ct.Cl.) (report of the Commissioner filed November 18, 1963).

3. Such expenses are broken down as follows:
Legal fees (Pullman, Comley, Bradley & Reeves) .. $10,840.55
Proxy solicitor's fees (Robert A. Weaver) ...... 8,782.17
Public relations fees (Market Relations Network) ... 14,789.01

$34,411.73

4. During 1955 and 1956 and until sometime after commencement of the instant action, plaintiff was known as "The Locke Steel Chain Company." By stipulation at the trial, the pleadings and other papers in the case were amended to reflect plaintiff's present corporate name, "Locke Manufacturing Companies".

from Connecticut to Indiana or to establish a branch chain manufacturing plant in Indiana. (Eventually it did move its chain manufacturing division to Huntington, Indiana.) Plaintiff's primary considerations for making chain in Indiana were to reduce the cost of raw materials by being closer to the source of steel; to reduce freight charges on the finished products by being closer to the manufacturing plants of its principal customers; to speed up delivery of finished products and repair parts; and possibly to reduce labor costs. In short, plaintiff's management was endeavoring more effectively to meet competition which had been increasing since World War II.

Plaintiff's plans to make chain in Indiana included negotiations with financial interests for financing the new operations in Indiana. Such negotiations were underway in the spring of 1955 when one William L. Belknap, III, of Easton, Connecticut, appeared on the scene.

## BELKNAP'S CHALLENGE OF PLAINTIFF'S CORPORATE POLICY

Belknap first contacted plaintiff through an attorney in April 1955, demanding a place on the Board of Directors. At that time he claimed to have 10,000 shares of the outstanding 110,000 shares of the company's common stock; he had acquired 9,000 of these shares within the previous nine months and had kept such shares in street name; the other 1,000 shares had been acquired by him as co-trustee within two years of his demand to be placed on the Board. There being no vacancy on the seven man Board which had been elected the previous October, Belknap's demand was rejected.

In his discussions with plaintiff's officers and directors, Belknap made clear his opposition to at least three aspects of plaintiff's corporate policy:

(1) The transfer to, or establishing in, Indiana, of a chain manufacturing plant, insofar as this involved borrowing approximately $800,000 to finance the expansion.

(2) The make up of the company's "inside" Board, a majority of which consisted of officers and employees of the company.

(3) The company's record (according to Belknap) of reduced earnings and dividends during the preceding years, especially when compared with the trend in the industry.

These three aspects of plaintiff's corporate policy were the chief subjects of the proxy soliciting material which later went out to stockholders from both sides, i. e. from Belknap and from management.

## THE PROXY CONTEST

After management's rejection of Belknap's demand for an immediate place on the Board and after rejection by Belknap of management's offer to nominate him for election to the Board at the next annual meeting if he would cooperate with management particularly with respect to plans for establishing the chain manufacturing plant in Indiana, Belknap demanded plaintiff's stockholder list so he could solicit proxies for the October 1955 annual meeting. Plaintiff refused voluntarily to furnish the list. Belknap thereupon instituted a mandamus action in the Superior Court for Fairfield County which resulted in an order granting him permission to inspect and copy the stockholder list.[5] From this order plaintiff

5. In a memorandum granting Belknap permission to inspect and copy the stockholder list (William L. Belknap, III v. The Locke Steel Chain Company, Superior Court, Fairfield County, No. 96468, July 12, 1955), Judge Thim stated (p. 3):
"During the past five years earnings and dividends of the defendant have been declining and the plaintiff believes this company can improve its position. He seeks an opportunity to present his case before the stockholders. Undoubtedly he intends to submit a slate of candidates to serve on the Board of Directors. Present management will have an opportunity to present their side of the issue to the stockholders. All stockholders at

appealed to the Supreme Court of Errors. Pending appeal, Belknap instituted an injunction action in the Superior Court and obtained an order enjoining the holding of the annual meeting in October. Plaintiff thereupon withdrew its appeal in the mandamus action; Belknap was given access to the stockholder list; and the injunction was modified to permit holding of a delayed annual meeting on December 6, 1955.

Faced with a proxy contest in which Belknap challenged basic corporate policy of plaintiff and through that challenge sought, not merely a place on the Board for himself, but to unseat the entire Board and to replace it with a Board of his own choosing, plaintiff did what any prudently managed corporation would do when confronted with such a challenge: it retained a public relations consultant (David Karr of Market Relations Network) and a proxy solicitor (Robert A. Weaver, formerly of Squires & Company) to work with plaintiff's counsel and its management in presenting plaintiff's case to its stockholders and in endeavoring to obtain a vote of confidence in plaintiff's challenged corporate policy by electing management's slate of directors at the delayed annual meeting. The end result of this team effort was the election of the management slate of directors by a 70,075 to 29,673 vote.

## PROXY CONTEST EXPENSES

■ For services to plaintiff in achieving a successful result in the proxy contest, legal counsel were paid $10,840.-55 (all of which the District Director allowed as an ordinary and necessary expense); the public relations consultant was paid $14,789.01 (of which $9,477.01 was allowed as an ordinary and necessary expense); and the proxy solicitor was paid $8,782.17 (none of which was allowed as an ordinary and necessary expense). In short, of the $34,411.73 proxy expenses incurred by plaintiff, $20,317.56 were allowed as ordinary and necessary expenses, $14,094.17 were disallowed. The theory for the disallowance is anything but clear to the Court.[6]

---

the meeting will then select the management they desire to have conduct the affairs of this corporation. This certainly appears to be the fair, orderly and equitable way of resolving the issue."

6. One basis upon which defendant's counsel at the trial (Tr. 18–19, 209–219) attempted to justify the disallowance of the $5,312 portion of the fee of the public relations consultant and the entire $8,782.17 fee of the proxy solicitor as not being ordinary and necessary expenses was that both amounts were included in the $28,763.39 amount allocated to "Litigation in connection with proxy fight and Expenses of proxy solicitation for Management" as set forth under the heading "4. Extraordinary Items" in the company's semi-annual report (Form 9–K) for the six month period ended December 31, 1955 filed with the SEC (Defendant's Exhibits L–1 and L–2; cf. Defendant's Exhibit M).

Defendant's position, even as to this, is inconsistent; for also included in the same amount set forth under "4. Extraordinary Items" is the sum of $10,840.55 for "Attorneys' fees and disbursements in connection with litigation and proxy solicitation" which the District Director allowed as an ordinary and necessary expense. Moreover, adding further confusion in an attempt to justify defendant's inconsistent position, its counsel at the trial stated (Tr. 18):

"Of the twenty-eight thousand labeled [in Defendant's Exhibit M] extraordinary, unusual and non-recurring, a little less than half has been disallowed. Now, that is to say, a little less—approximately fourteen thousand has been disallowed."

Defendant's reliance upon the company's reporting profit and loss and earned surplus information in its semi-annual report (Form 9–K), for the purpose of the Director's determining what constitutes "ordinary and necessary expenses" within the meaning of Section 162(a) of the Internal Revenue Code of 1954, aside from reflecting its inconsistent and untenable position, is utterly misplaced. Filed pursuant to Section 13 or Section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78m or 78o(d)) and the rules promulgated thereunder (SEC Rules X–13a–13 or X–15d–13), the company's semi-annual report (Form 9–K) was a disclosure document and nothing more. Specifically, the item in the Form 9–K here involved was intended to show "the differentiation of recurring and non-

■ Once defendant has conceded the propriety of allowing a deduction under Section 162(a) for certain of the expenses incurred by management during the proxy contest—a concession which logically recognizes that the proxy contest was over company "policy"—it is difficult to follow defendant's contention that the other expenses incurred at the same time and for the same purpose are not similarly deductible as ordinary and necessary. Here, as in any proxy contest, the work performed by management's legal counsel, its public relations consultant and its professional proxy solicitor had one objective—to obtain from a fully informed body of stockholders as many valid proxies as possible. For defendant to allow a deduction for *all* the fees of legal counsel, for *part* of the fees of the public relations consultant, and for *none* of the fees of the proxy solicitor, amounts to an illogical splin-

tering of the roles played by these persons in what is essentially an indivisible joint effort. Neither authority nor reason supports defendant's position.

## APPLICABLE LAW

■ The Court holds that plaintiff has established by a clear preponderance of the evidence that *all* expenses incurred by it in the course of the proxy contest between Belknap and management were incurred in a dispute over "policy", not "personalities"; [7] that such expenses, which were reasonable in amount, were incurred for the benefit of all stockholders in the good faith belief on the part of management that it was in the best interests of all stockholders successfully to resist Belknap's attempt to unseat the incumbent Board and to replace it with Belknap's slate; and that payment of all proxy expenses incurred by plaintiff, accordingly, was proper.[8]

recurring income" (15 U.S.C. § 78m(b)) —"for the proper protection of investors and to insure fair dealing in the security" (15 U.S.C. § 78m(a)). It was not intended as an item to ascertain revenue; nor does it have any relevance whatsoever in the determination of what are "ordinary and necessary expenses" within the meaning of the Internal Revenue Code of 1954. Neither the SEC nor the IRS has ever regarded the disclosure under "4. Extraordinary Items" of a Form 9-K as having any bearing upon what are "ordinary and necessary expenses" under Section 162(a). Certainly the IRS would not wish to be bound by the converse of the estoppel argument here urged by defendant's counsel.

The Court rejects defendant's game of cross-estoppel and relies upon the principle underlying Welch v. Helvering, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212 (1933), in holding that nonrecurring items of expense incurred by plaintiff in the proxy contest were nevertheless ordinary expenses "because we know from experience that payments for such a purpose, whether the amount is large or small, are the common and accepted means of defense against attack." (Id. at 114.)

7. The distinction between "policy" and "personalities" is not always clear, nor is it particularly useful, as noted in Steinberg v. Adams, 90 F.Supp. 604, 608 (S.D. N.Y.1950):

"The simple fact, of course, is that generally policy and personnel do not exist in separate compartments. A change in personnel is sometimes indispensable to a change of policy. A new board may be the symbol of the shift in policy as well as the means of obtaining it."

For whatever the distinction may be worth, however, the instant case is as clear as they come of a proxy contest the dominant thrust of which was defense of corporate policy by management and attack upon that policy by Belknap.

8. See II Loss, Securities Regulation 857–862 (2d ed. 1961) and cases there cited; Aranow & Einhorn, Proxy Contests For Corporate Control 485–507 (1957) and cases there cited; 5 Fletcher, Private Corporations § 2058.1 (perm. ed. rev. repl. 1952) and cases there cited; Note, Proxy Fight Expenses: Problems of Tax Deduction, 43 Va.L.Rev. 891, 892–894 (1957) and cases there cited.

The propriety of payment of management's proxy expenses by plaintiff corporation, including fees of a professional proxy solicitor and fees of a public relations consultant, should be determined on the basis of Connecticut corporate law, plaintiff being a Connecticut corporation. This question, however, has never been decided by the Connecticut Supreme Court of Errors, nor by any Connecticut state court, so far as this Court has been able to ascertain. This Court assumes, therefore, for purposes

Having decided the threshold question whether the challenged proxy solicitation expenses were properly paid by plaintiff corporation, we come now to the question whether such expenses are deductible under Section 162(a) as ordinary and necessary expenses. The bare language of Section 162(a) that "There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business" hardly solves the problem of its construction. While the judicial gloss upon the words "ordinary and necessary" is substantial, it is more conducive to confusion than to clarity. To attempt to harmonize the cases construing "ordinary and necessary" would be, as Justice Cardozo concluded, "a futile task." [9]

What is clear is that to be deductible under Section 162(a) an expense must be both ordinary and necessary.[10] With regard to the latter, the Supreme Court has indicated that the federal courts "should be slow to override [the taxpayer's] judgment" that expenses were "necessary for the development of the [taxpayer's] business, at least in the sense that they were appropriate and helpful." [11] With regard to what is "ordinary", the Supreme Court has said:

"Now, what is ordinary, though there must always be a strain of constancy within it, is none the less a variable affected by time and place and circumstance. Ordinary in this context does not mean that the payments must be habitual or normal in the sense that the same taxpayer will have to make them often. A lawsuit affecting the safety of a business may happen once in a lifetime. The counsel fees may be so heavy that repetition is unlikely. None the less, the expense is an ordinary one because we know from experience that payments for such a purpose, whether the amount is large or small, are the common and accepted means of defense against attack. Cf. Kornhauser v. United States, 276 U.S. 145. The situation is unique in the life of the individual affected, but not in the life of the group, the community, of which he is a part. At such times there are norms of conduct that help to stabilize our judgment, and make it certain and objective. The instance is not erratic, but is brought within a known type." [12]

The instant case presents a close anology to the "once in a lifetime" lawsuit referred to in Welch v. Helvering, supra. Just as it was there recognized that the defense of an isolated lawsuit could be an "ordinary" business expense, clearly today it is equally "ordinary" for a company in the course of its first or only proxy contest to incur considerable expenses for legal counsel, proxy solicitors and public relations experts in order to

---

of this case, that the Connecticut courts, if presented with this question, would hold in accordance with the majority rule that such management proxy solicitation expenses may properly be paid by the corporation when incurred in the interest of intelligent exercise of judgment by the stockholders; when the dispute is one over corporate policy; when the incumbent board of directors acts in the good faith belief that it is in the best interests of all stockholders to obtain a vote of confidence in management's challenged corporate policy by electing management's slate of directors; and when the proxy solicitation expenses are reasonable in amount (Ricciuti v. Voltarc Tubes, Inc., 277 F.2d 809, 812 (2 Cir. 1960); Hazlitt v. Fawcett Publications,

Inc., 116 F.Supp. 538, 544 (D.Conn. 1953); Masterson v. Atherton, 223 F. Supp. 407, 410 (D.Conn.1963), aff'd, 328 F.2d 106 (2 Cir. 1964); 1A Moore's Federal Practice ¶ 0.309 [2], at 3326–3330 (2d ed. 1961)).

9. Welch v. Helvering, supra note 6, at 116.

10. Id. at 113.

11. Ibid.

12. Id. at 113–114. See Hochschild v. Commissioner of Internal Revenue, 161 F.2d 817 (2 Cir. 1947), where expenditures in excess of $4,000 by a director and substantial stockholder of a corporation in the successful defense of a stockholder's derivative suit were held to be "ordinary and necessary" business expenses.

defend the policies of its directors from attack by those who would oppose them.[13]

■ It has been decided recently in two Circuits that expenses for proxy solicitation are properly deductible as "ordinary and necessary" expenses within the meaning of Section 212 of the Internal Revenue Code of 1954.[14] No reason appears why a different construction should be given to the same language in Section 162(a).[15]

■ In applying the statutory standard of "ordinary and necessary" to the facts of the instant case, it is appropriate to bear in mind Justice Cardozo's observation in Welch v. Helvering, supra, that that standard is not a rule of law but a way of life:[16]

"Here, indeed, as so often in other branches of the law, the decisive distinctions are those of degree and not of kind. One struggles in vain for any verbal formula that will supply a ready touchstone. The standard set up by the statute is not a rule of law; it is rather a way of life. Life in all its fullness must supply the answer to the riddle."

A proxy contest has become a part of the corporate way of life; and the economic life of a corporation in all its fullness is the backdrop against which expenses incurred in a proxy contest must be analyzed to find the answer to the riddle whether they are ordinary and necessary from the revenue standpoint.

■ Struggles for corporate control have been going on for many years— as long as the corporate form of organization has been recognized. During the past three decades the focus in proxy contests has been upon the SEC because of the duty entrusted to it by Congress of implementing a shareholder's right to vote and protecting the investing public against misleading statements made in the course of a struggle for corporate control.[17]

Congress made clear its intention in enacting the Securities Exchange Act of 1934[18] of promoting corporate democracy and shareholder participation in the affairs of the corporation: "Fair corporate suffrage is an important right that should attach to every equity security bought on a public exchange."[19]

Whether the ideal of corporate democracy is reflected in the proxy contest

13. See Aranow & Einhorn, op. cit. supra note 8, at 13–14, 20–21, 230, 500; Note, Proxy Fight Expenses: Problems of Tax Deduction, supra note 8, at 908–910.

14. Graham v. Commissioner of Internal Revenue, 326 F.2d 878 (4 Cir. 1964) acq., Rev.Rul. 64–236, 1964 Int.Rev. Bull. No. 35, at 11; Surasky v. United States, 325 F.2d 191 (5 Cir. 1963), partial acq., Rev.Rul. 64–236, 1964 Int.Rev. Bull. No. 35, at 11. In Graham, there was involved an amount paid by the taxpayer director as his share of settlement of stockholders' suits, based on reimbursement for expense of proxy solicitations to change corporate management. In Surasky there was involved an amount paid by the taxpayer stockholder as his share of the expenses of a stockholders committee to solicit proxies in an effort to gain sufficient seats on the board of directors to change corporate policies in the hope of obtaining increased dividends and a stock split.

15. See Surasky v. United States, supra note 14, at 194, where the court noted that "The parties [including the United States] also agree that in construing the language of Section 212, it is to be taken in *pari materia* with Section 162 so far as relates to the language 'ordinary and necessary business expenses.'" See also Note, Proxy Fight Expenses: Problems of Tax Deduction, supra note 8, at 894–896, and legislative history there noted.

16. Welch v. Helvering, supra note 6, at 114–115.

17. Securities and Exchange Commission v. May, 229 F.2d 123, 124 (2 Cir. 1956); cf. Howard v. Furst, 140 F.Supp. 507, 512 (S.D.N.Y.1956), aff'd, 238 F.2d 790 (2 Cir. 1956), cert. denied, 353 U.S. 937, 77 S.Ct. 814, 1 L.Ed.2d 759 (1957).

18. 15 U.S.C. § 78a et seq.

19. H.R.Rep. No. 1383, 73d Cong., 2d Sess. 13 (1934).

as we know it today is not for this Court to assess.[20] But in analyzing expenses incurred by management for proxy solicitation and shareholder relations in a proxy contest—in seeking to determine whether they comport with the statutory standard of "ordinary and necessary", whether they were incurred as a "common and accepted means of defense against attack", and whether there are "norms of conduct that help to stabilize our judgment, and make it certain and objective"—we appropriately can draw upon the experience and expertise of the SEC for guidance as to the standard or norm of conduct in the life of the corporate community with regard to proxy solicitation.[21]

One of the draftsmen of the Securities Exchange Act of 1934 testified unequivocally at the hearings on that statute in 1934 that Section 14(a) did not prohibit solicitation of proxies at the expense of the company, that being left to state law.[22] After more than two decades of administrative experience under the Act, the SEC in 1957 stated, in response to an inquiry from Congress, that it was opposed to any substantive limitation on amounts spent in proxy contests:[23]

[*Question by Subcommittee of Senate Committee on Banking and Currency*]:

"18. Does your experience indicate that some limitation, either in terms of absolute amounts, in terms of a percentage of assets, or in some other way, should be placed upon the amount of money spent in a proxy contest? If not, should the expenses incurred be filed with some public agency?

[*Answer by SEC*]:

"In their present form, the proxy rules require both sides in a proxy contest to estimate the amount of their proposed expenses (including proposed fees to attorneys, accountants, public relations or financial advisers, solicitors, printing, transportation, litigation and other costs incidental to the solicitation) and requires these estimates to be included in the soliciting literature of the respective contestants. Thus, not only are such estimated expenses required to be filed with a public agency but they are actually made a part of the proxy material distributed to the shareholders.

\* \* \* \* \* \*

"In view of these provisions of the proxy rules which enable security holders to appraise the importance of the proposed expenditures to them, it appears unnecessary to place limitations on the amounts to be expended by the parties. The amounts of such expenditures are in most cases governed by the particular circumstances and will vary with respect to such factors as the num-

---

20. See Caplin, Proxies, Annual Meetings and Corporate Democracy: The Lawyer's Role, 37 Va.L.Rev. 653 (1951).

21. During fiscal 1963, 2,396 proxy statements in definitive form were filed with the SEC under its Regulation 14; there were 2,205 solicitations of proxies for the election of directors; 83% of all issuers with voting securities listed and registered on national securities exchanges solicited proxies for the election of directors under the SEC's proxy rules; and there were 27 companies involved in proxy contests for the election of directors in which detailed statements were filed by 376 persons as participants under Rule X–14a–11 (29 SEC Ann.Rep. 53–55 (1963)).

22. Stock Exchange Regulation, Hearings Before House Committee on Interstate and Foreign Commerce on H.R. 7852 and H.R. 8720, 73d Cong., 2d Sess. 141 (1934).

23. SEC Enforcement Problems, Hearings Before Subcommittee of Senate Committee on Banking and Currency, 85th Cong., 1st Sess. 115 (1957).

Compare Section 12(e) of the Public Utility Holding Company Act of 1935 (15 U.S.C. § 79*l*(e), and Rule U–65 thereunder, which does limit expenses in connection with proxy solicitations under that Act. See II Loss, op. cit. supra note 8, at 1023.

ber of shareholders and their accessibility as well as the extent and scope of the issues to be debated in the contest. Any substantive limits on the amount of permissible expenditures may well deprive shareholders of sufficient information to enable them to form intelligent judgments."

The company in the instant case, in compliance with the SEC's proxy rules, filed a proxy statement setting forth, among other things, the estimated cost and proposed method of solicitation, including the anticipated use of a professional proxy solicitor.

At the three day trial of this case, participants on both sides of the proxy contest testified, including Belknap (leader of the insurgents); Osborne, Lockwood and Mason (officers and incumbent directors of the company); Karr (the public relations consultant); and Squires (president of the proxy solicitation firm of which Weaver had been manager). The Court, in weighing their testimony, applied such recognized tests as: their demeanor while on the stand; any interest they might have in the outcome of the case; any bias or prejudice for or against either party; their opportunity to observe; any reason to remember or forget; the inherent probability of their testimony; its consistency or lack of consistency; and its corroboration or lack of corroboration with other credible evidence. The testimony of the witnesses, moreover, has been weighed in the light of—and indeed has cast light upon—the exhibits, including the proxy materials on both sides, the proceedings in the mandamus and injunction actions in the Superior Court, the minutes and other corporate records of the company, correspondence and depositions.

 Upon the entire record, the Court finds that the proxy contest expenses incurred by plaintiff in the instant case were "ordinary and necessary" within the statutory definition. Indeed defendant has conceded the propriety of the deduction of the bulk of such expenses as ordinary and necessary.[24]

### CONCLUSION

The portions of plaintiff's proxy solicitation expenses which were disallowed by the District Director ($5,312.00 of public relations fees and $8,782.17 of proxy solicitor's fees), having been properly paid by plaintiff as corporate expenses, are deductible by plaintiff as ordinary and necessary expenses pursuant to Section 162(a) of the Internal Revenue Code of 1954.

Judgment accordingly may enter in favor of plaintiff to recover the sum of $8,409.97, representing the deficiency paid by plaintiff March 2, 1959, together with interest provided by law.

24. At the close of plaintiff's case and more than two years after the pleadings had been closed, defendant orally moved to amend its answer to set forth a further defense to the instant action, namely, that portions of the salaries of plaintiff's corporate officers, directors and employees were improperly deducted during plaintiff's taxable year ending June 30, 1956 because these persons engaged in the solicitation of management proxies. Defendant's counsel characterized the motion as one pursuant to Rule 15(b), Fed.R.Civ.P., to amend the pleadings to conform to the evidence; he agreed, however, that there had been no such evidence up to that point to which the pleadings appropriately could be conformed. Defendant's oral motion was denied.

On the last day of trial, defendant's counsel filed, pursuant to Rule 15(b), Fed. R.Civ.P., a written motion to amend its answer to set forth the further defense referred to above. The Court reserved decision on the motion.

It is clear that defendant's written motion must also be denied. The issue of the propriety of tax deductions for salaries paid to plaintiff's officers, directors and employees was not raised in the pleadings or the pre-trial order in this case. It was not "tried by express or implied consent of the parties." Indeed, plaintiff's counsel expressly objected to the introduction of such issue after plaintiff's case was concluded. Accordingly, defendant's motion is denied, pursuant to Rule 15(b), Fed.R.Civ.P.