Irving **ROSNER**, Leah Vishno and Joseph Bacchiocchi, d/b/a **R–D** Frozen Foods, Plaintiffs,

v.

**MODERN MAID PACKERS, INC.,** Defendant.

Civ. No. 9228.

United States District Court
D. Connecticut.

Aug. 2, 1967.

Irving H. Perlmutter, of Ullman, Perlmutter & Ullman, and Milton Rice, New Haven, Conn., for plaintiffs.

Stephan L. Hilcoff, New Haven, Conn., for intervening plaintiff Milton Rosner.

L. Stewart Bohan, of Dice, Bohan & Hitt, Meriden, Conn., for defendant.

TIMBERS, Chief Judge.

Plaintiffs brought this diversity action to recover for alleged anticipatory breach of a ten year sales commission and exclusive distributorship agreement.

Following trial on the merits to the Court without a jury, the Court makes the following findings of fact and conclusions of law, pursuant to Rule 52(a), Fed. R.Civ.P.

## FINDINGS OF FACT

1. All parties plaintiff are citizens of Connecticut; defendant, being a Pennsylvania corporation and having its principal place of business in Pennsylvania, is a Pennsylvania citizen. The amount in controversy exceeds $10,000, exclusive of interest and costs.

2. From some date in 1957 or 1958 until February 1, 1961, there existed a common law partnership known as R-D Frozen Foods (hereinafter "R-D"), engaged in the business of purchase and resale of frozen food products, principally within a 50 to 60 mile radius from the City of New Haven, Connecticut. There were four partners: Joseph Bacchiocchi, Irving Rosner, Milton Rosner and Leah Vishno. Joseph Bacchiocchi was in charge of the warehouse, and Leah Vishno was in charge of the business office. Milton Rosner and Irving Rosner were responsible for promotion and sales; Irving Rosner had the additional overall executive responsibility. There was no written partnership agreement.

3. R-D's personnel and facilities interlocked to an extent with those of Ross-Darwin Food Company, Inc. (hereinafter "Ross"), a much larger organization headed by Irving Rosner and concerned with sale of canned goods and other so-called dry groceries to institutional customers such as schools and hospitals. Milton Rosner was a salesman for Ross as well as a partner of R-D, and also worked part time as a professional baseball scout.

4. Defendant Modern Maid Packers, Inc. was at all times here involved engaged in the enterprise of processing and packaging frozen meat products for sale to distributors and other commercial customers.

5. Prior to 1959, R-D began to purchase defendant's institutional line for

resale to its institutional customers. Orders were placed through Mark Messier, defendant's area representative; in early 1959, Messier terminated his relationship with defendant, and R-D purchased directly from defendant, receiving a 3% discount.

6. In the spring and summer of 1959, defendant introduced a retail line, frozen meats packaged for sale in retail outlets such as grocery stores and supermarkets. R-D began selling the retail line in the New Haven area, again receiving a 3% commission; at defendant's expense, R-D undertook a program of sales promotion by means of demonstrations of the products in area retail food stores. Milton Rosner was the partner primarily responsible for organizing and carrying out the demonstrations.

7. In the early fall of 1959, Sidney Levitz, president of the defendant corporation, entered into discussions with Milton and Irving Rosner concerning geographical expansion of retail line sales, because of the successful local promotion.

8. As a result of such discussions, it was agreed that the services of a larger organization with wider contacts would be desirable in effecting the expansion sought by defendant.

9. Defendant was then introduced to Consolidated Brokers of New England, Inc. (hereinafter "Consolidated"), a frozen food brokerage company. At a meeting in the Taft Hotel in New Haven in October or November of 1959, defendant agreed to hire Consolidated as its broker for the retail line in Connecticut and Massachusetts, with compensation set at 3% of the area sales.

10. In contemporaneous meetings between Levitz and Irving and Milton Rosner, a separate agreement was entered into by defendant and R-D. Most of the essentials of that agreement appear in subsequent correspondence between the parties in November and December of 1959[1]; the full understanding reached was as follows:

(a) R-D would be exclusive Connecticut distributor of defendant's institutional products, and would receive 3% sales service allowance on its purchases from defendant; the consideration was to be R-D's efforts in introducing such products into the Connecticut market;

(b) R-D would also be paid a 1% sales service allowance on all sales of the retail products in the New England area,[2] in return for R-D's assistance in expanding the existing retail market and in overseeing all such sales in the New England area; and

(c) The foregoing arrangements would continue for a period of ten years.

11. In the course of its dealings with R-D, defendant had more contact with Milton Rosner than with any other partner. At the time of the 1959 retail store demonstrations, Milton Rosner began to draw $25 per week salary from R-D; the increased compensation was at least partly attributable to his efforts on behalf of defendant, and no equivalent increase resulted to his co-partners. Approximately 70% of R-D's sales and promotion work in general was done by Milton Rosner; he handled the volume accounts, the accounts with the highest potential, and was responsible for bringing in new customers. In 1959 and 1960, partnership profits were divided as follows: Joseph Bacchiocchi, one-third; Milton Rosner, one-third; Irving Rosner, one-sixth; Leah Vishno, one-sixth. In 1960, Milton Rosner put in approximately twice the time that Irving Rosner did in promotion, sales, and servicing existing accounts for R-D.

12. In late 1959 and early 1960, R-D was quite active in promoting defendant's retail line in conjunction with Consolidated; contacts were made with large chain stores, and Milton Rosner persuad-

---

1. Plaintiffs' Exhibits 2–5.

2. By subsequent agreement among the R–D partners, the 1% was paid directly to Irving and Milton Rosner.

ed a large retail distributor to purchase defendant's products. The number of retail outlets carrying defendant's goods increased significantly.

13. By late 1960, however, R-D's efforts in connection with the retail line had diminished considerably, and Consolidated was requesting an additional 2% fee as compensation for taking on the burden of sales service work. On November 1, 1960, Levitz sent a letter [3] to Milton and Irving Rosner, detailing the account servicing duties expected of R-D; Irving Rosner complained to Levitz that the responsibilities expected of R-D were excessive, but the partnership did take steps to comply.

14. By this time, Milton Rosner and Irving Rosner were in disagreement over possible expansion of the institutional line, and Milton Rosner had begun to consider withdrawal from R-D and establishment of his own business. Levitz was aware of the possibility, but did not encourage it.

15. Four to six weeks after November 1, 1960, Levitz learned that Milton Rosner was definitely leaving R-D, and was expressly advised of that fact by both Irving and Milton Rosner in December or January of 1961.

16. On or about February 1, 1961, Milton Rosner withdrew from R-D, and commenced a competing enterprise known as M&R Frosted Food Co. On February 2, 1961, Irving Rosner sent a letter to Milton Rosner formally announcing that Milton Rosner was no longer a member of the R-D partnership, and that same date also notified the firm's bank in New Haven of the withdrawal, revoking Milton Rosner's authority to draw checks on the partnership account. A written dissolution agreement,[4] signed by Irving and Milton Rosner and Joseph Bacchiocchi, was made on January 27, 1961, but not executed until March 27, 1961.

17. On February 7, 1961, defendant's attorney informed Irving and Milton Rosner by mail that defendant considered the 1959 contract with R-D no longer in effect.[5]

18. Subsequent to the withdrawal of Milton Rosner from R-D, defendant granted Consolidated an additional 2% sales allowance.

19. In April of 1961, defendant started shipping products to M&R Frosted Food Co.

20. By letter of December 6, 1961 [6], counsel for the new R-D partnership (consisting of Joseph Bacchiocchi, Irving Rosner and Leah Vishno) demanded payment from defendant as of February 7, 1961, in accordance with the 1959 contract.

21. In early 1962, the instant action was commenced in the Superior Court for New Haven County, and was subsequently removed to this Court; Milton Rosner was granted leave to intervene as a party plaintiff on September 21, 1964.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over the parties to, and the subject matter of, this action.[7]

2. The contractual relationship upon which the action is founded is governed by the law of the State of Connecticut.

3. The correspondence between R-D and defendant in the fall of 1959 was only a partial integration of the effective agreement between the parties, and parol evidence was admissible to show the nature and extent of the mutual obligations forming the contract.

4. The contract between R-D and defendant was as follows:

(a) R-D would be exclusive distributor in Connecticut of defendant's institutional products, and would re-

---

3. Plaintiffs' Exhibit 6.

4. Defendant's Exhibit A.

5. Plaintiffs' Exhibit 7.

6. Plaintiffs' Exhibit 8.

7. The action being one over which United States District Courts have original jurisdiction under 28 U.S.C. § 1332(a) (1) and (c), it was properly removed to this Court upon defendant's petition, pursuant to 28 U.S.C. § 1441(a).

ceive 3% sales service allowance on its purchases from defendant; in return, R-D would expend its best efforts in attempting to introduce such products into the Connecticut market;

(b) R-D would receive a 1% sales service allowance on all sales of defendant's retail products in the New England area; in return, R-D would assist defendant's New England retail broker, Consolidated, in expanding the existing retail market in New England for such products, and would oversee all such retail sales accounts to be obtained in the New England area;

(c) The contract would be in force for ten years.

5. In addition, essential to the purposes of the contract was the personal contribution to R-D's promised performance of one of that firm's partners, Milton Rosner.

6. Milton Rosner withdrew as a partner of R-D prior to February 7, 1961.

7. Such withdrawal terminated defendant's contractual obligations with respect to the partnership.

8. Subsequent notice from defendant that it considered the contract no longer in effect did not constitute anticipatory breach, and defendant is therefore entitled to judgment.

## OPINION

■■ The parties agree that a valid contract was made between defendant and the R-D partnership in the fall of 1959 [8], and that the law of Connecticut governs the Court's analysis of the nature and extent of the obligations entered into by the contracting parties.[9]

It is also clear that the original contract was verbal, and that the entire agreement was not reduced to writing; the subsequent correspondence between the contracting parties in attempted confirmation and clarification of the mutual undertakings [10] did not fully embody the respective obligations assumed in the original oral agreement. In such circumstances, oral testimony was admissible to prove the true character of, and conditions involved in, the entire contract.[11] Such testimony was received from both sides in the course of the trial, and having weighed such testimony in accordance with the recognized tests of credibility,[12] and having also fully considered the areas of undisputed fact, the Court arrived at the findings of fact and conclusions of law set forth above.

■ Plaintiffs' contention that the principal, indeed the only, consideration moving from R-D consisted of the partnership's assistance in bringing Consolidated and defendant together in a food brokerage agreement is simply unsupported by credible evidence. What does appear is that both R-D and defendant were anxious to continue an on-going as-

---

8. Defendant has withdrawn its defense of illegality under 15 U.S.C. § 13(c); it is worthy of note that such a defense, even if pressed, might not be available to defendant. Cf. Aluminum Company of America v. Tandet, 235 F.Supp. 111, 115 (D.Conn.1964).

9. See Guaranty Trust Co. of New York v. York, 326 U.S. 99 (1945). It is questionable whether the contract was "made" in Connecticut or in Pennsylvania, but since its operative effect and place of performance was to be principally in Connecticut, Connecticut's substantive rules of contract law are controlling. See Jenkins v. Indemnity Insurance Co. of North

America, 152 Conn. 249, 253, 205 A.2d 780, 782–783 (1964).

10. Plaintiffs' Exhibits 2–5.

11. See, e. g., Asbestos Products Corporation v. Matson, 97 Conn. 381, 384–385, 116 A. 680, 681–682 (1922); Brosty v. Thompson, 79 Conn. 133, 135–136, 64 A. 1, 2 (1906).

12. See, e. g., Lomartira v. American Automobile Insurance Company, 245 F.Supp. 124, 131 (D.Conn.1965), aff'd, 371 F.2d 550 (2 Cir. 1967); Locke Manufacturing Companies v. United States, 237 F. Supp. 80, 89 (D.Conn.1964).

sociation in some fashion appropriate to R-D's abilities to meet defendant's expanding requirements, in light of the successful commercial relationship between the two organizations in the spring and summer of 1959.

 R-D's consideration for the distributorship and commission arrangement obtained from defendant was to work for continued expansion of the institutional line in Connecticut, to assist Consolidated in the same manner with respect to the retail line, and to supervise retail accounts thereby secured in the New England area. R-D did in fact procure a significant increase in business for defendant in late 1959 and early 1960, although the boundaries of its obligations were poorly defined; when defendant, feeling that R-D's efforts were slackening, attempted in the fall of 1960 to detail the precise duties expected [13], R-D objected but did make some attempts to comply.[14]

That the consideration from R-D for the 1959 contract was to be such promotion, sales and supervisory effort is borne out in part by the ensuing correspondence [15], in part by the subsequent conduct of the parties, in part by the testimony of Sidney Levitz, and in part by the very fact that the lucrative benefits to be expected by R-D could be commercially consonant only with such a corresponding undertaking by the partnership. The Court is not persuaded that such benefits were intended to be conferred in exchange for the simple act of introducing two organizations to one another, nor, on the other hand, that a small partnership would devote a significant amount of its time and effort to work on behalf of others as a mere gratuity.

Defendant was plainly impressed with the partnership's capabilities in promotion, sales and handling of customer accounts, as evidenced in the prior dealings of its president, Sidney Levitz, with Irving and Milton Rosner. It cannot be disputed that the expanded association with R-D envisaged by defendant turned upon defendant's assessment of its prior experience with those two partners, the only members of the firm who carried on the vital customer contact work. The critical question is whether the personal contribution of one of the two, Milton Rosner, was considered essential to the contemplated arrangement.

 On this point, the evidence is with defendant. Milton Rosner was primarily responsible for execution of the successful retail demonstrations on defendant's behalf in the summer of 1959. It is uncontested that he handled by far the greater part of the partnership's sales and promotion work in general, bringing in new business and servicing the large-volume, high-potential accounts. Defendant's negotiations were conducted with both Irving and Milton Rosner; in view of Milton Rosner's proven ability and widespread personal contacts, the testimony of Levitz that Milton Rosner's personal efforts were vital to the R-D contract is entirely worthy of belief.

Milton Rosner's role subsequent to formation of the contract was not altered or diminished. Indeed, he was chiefly responsible for bringing in additional new business, and in 1960 did approximately twice as much of the crucial "outside" work as Irving Rosner.

Early in 1961, Milton Rosner effectively withdrew from the R-D partnership. The exact date is not clear, but it is quite evident that prior to its letter of February 7, 1961, defendant had received direct notice of Milton Rosner's withdrawal, Irving Rosner had sent a letter to Milton Rosner indicating that the latter was no longer considered a partner and had also notified the firm's bank that Milton Rosner no longer had authority to draw on the R-D account, and Milton Rosner had started operation of his own business in

---

13. Plaintiffs' Exhibit 6.

14. Defendant has withdrawn a claim of failure of consideration during the continuance of the original R–D partnership.

15. Plaintiffs' Exhibits 2–5.

competition with his former colleagues. To that withdrawal, the rather ambiguous "dissolution" instrument [16], dated January 27, 1961 and bearing the execution date of March 27, 1961, added nothing as far as R-D's legal relations with defendant were concerned.

In creating the agreement in 1959, defendant was entitled to rely on Milton Rosner's continued performance as a co-partner in R-D, and did so. In the context of a small partnership, with so much of the business as was vital to defendant's interests entrusted to one partner, the contractual arrangement contemplated entailed great reliance upon the effective participation of that partner and necessarily involved a highly personal element. When Milton Rosner withdrew from R-D, the benefits of his skills, experience, and personal contacts were also withdrawn; the entry of Milton Rosner into his own directly competing enterprise served to intensify the loss to R-D and to defendant. In these circumstances, fundamentally altering the composition of R-D and the nature and quality of the relationship between the former partnership and defendant, defendant had the right to consider its contractual obligations terminated, for Milton Rosner's personal role in the performance of R-D's obligations was crucial to the agreement, and could not effectively be delegated to the successor partnership.[17]

## ORDER

Plaintiffs having failed to prove breach of contract by defendant, and defendant therefore being entitled to judgment in its favor, with costs, the Clerk is directed to enter judgment accordingly.

16. Defendant's Exhibit A.

17. See Burkle v. Superflow Manufacturing Company, 137 Conn. 488, 493–494, 78 A.2d 698, 701 (1951) ; see also 1 Restatement, Contracts § 160(3) (a) (1932 ed.) ; 4 Corbin, Contracts § 865 (1951 ed.) ; cf. Conn.Gen.Stat. § 42a–2–210(1) (1958). The Court's determination is based on the evidence as to the special personal contribution of Milton Rosner to the R–D partnership, for defendant's contention that the 1959 agreement created an agency relationship, a contract for personal services as a matter of law, cf. Knudsen v. Torrington Company, 254 F.2d 283 (2 Cir. 1958), is not supported by sufficient evidence of that control by defendant over R–D which is necessary to a finding of agency. See, e. g., Bieluczyk v. Crown Petroleum Corporation, 134 Conn. 461, 465–469, 58 A.2d 380, 382–384 (1948) ; Ross v. Post Publishing Co., 129 Conn. 564, 567, 29 A.2d 768, 769–770 (1943) ; but cf. Restatement of Agency 2d § 14N (1958 ed.).