**UNITED STATES of America**
**v.**
**Richard Anthony CAPALDO.**
**Crim. No. 11972.**

United States District Court
D. Connecticut.

Nov. 1, 1967.

Samuel J. Heyman and J. Daniel Sagarin, Asst. U. S. Attys., New Haven, Conn., for the United States.

Richard L. Jacobs, New Haven, Conn., for defendant Capaldo.

TIMBERS, Chief Judge.

This is a motion by the defendant Richard Anthony Capaldo for judgment of acquittal notwithstanding a verdict of guilty or, in the alternative, for a new trial. The defendant was convicted along with Louis M. Ursini, Jr., on three counts of violating the federal bank robbery statute, 18 U.S.C. §§ 2113(a), (b), and (d). Trial of the action commenced on September 13, 1967 and ended on October 4, 1967. In all, thirty-seven witnesses testified.

The instant motion was filed on October 11, 1967. Numerous grounds are offered in support of the motion. With one exception, these grounds are utterly without foundation or have been previously raised by defendant's counsel, and considered and then rejected by the Court. They will not be discussed here.

The one ground that requires further consideration is the contention by the defendant that newly discovered evidence merits granting the motion. In the course of a hearing held by the Court on defendant's motion on October 17 and October 30, 1967, defendant's counsel attempted to adduce testimony to show that one of the witnesses against the defendant at the trial had admitted to framing the defendant and to having induced two other witnesses to do the same thing. Exactly what was adduced will be subsequently discussed; at this point it is sufficient to point out that the mere fact that additional evidence is offered subsequent to a trial does not mean that a new trial must be ordered. There are, in fact, a number of pre-conditions which must be satisfied before a new trial based on newly discovered evidence can be granted: "(a) the evidence must be in fact, newly discovered, i. e., discovered since the trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; (c) the evidence relied on, must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal." [1] It would appear

1. Johnson v. United States, 32 F.2d 127, 130 (8 Cir. 1929), quoted in United States v. On Lee, 201 F.2d 722, 723 (2 Cir. 1953), cert. denied, 345 U.S. 936 (1953).

inadequate for a defendant to simply show that testimony at the trial was perjured, i. e., to impeach the credibility of a witness or witnesses, rather than to show that in fact the defendant did not commit the crime.[2] Because defendant's post-trial offering bears only on the question of credibility of a trial witness and not on the guilt or innocence of the defendant, the motion could thus be denied without more. Nevertheless, since a motion for a new trial is addressed to the Court's discretion,[3] it is possible that the Court would feel justified in ordering a new trial if: (1) it felt that trial testimony was indeed perjured; and (2) that "without the perjured testimony the jury *might* have reached a different conclusion;" and (3) "the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial." [4] It therefore falls upon the Court at the outset to determine if the newly offered evidence is credible.

In order to discuss the credibility of the evidence now offered by defendant Capaldo, some background is necessary. Capaldo and Ursini were charged with having robbed the Oakville Branch of the Waterbury Savings Bank of over $20,000 on December 18, 1963. At the trial the most damaging evidence offered against Capaldo was the testimony of three members of a family. This evidence consisted of detailed and convincing accounts of admissions of the crime made by Capaldo directly to or within the hearing of these people.

Robert Longo testified that he had been a friend of Capaldo and in March of 1964 had kept a horse out in back of Capaldo's home on Old Colonial Road in Oakville. Sometime late in that month he went over to Capaldo's home, together with a young girl named Pamela Hansen, now Longo's stepdaughter. Their purpose was to feed Longo's horse, and while there they met Capaldo. Longo testified that in the course of conversation with Capaldo he asked Capaldo where "he got the horses and the cars" since "he wasn't working at the time" and that he then asked Capaldo "if he did the Oakville bank job." Capaldo's reply at this time was: "I'll never tell." But, according to Longo, Capaldo did tell at a later time.

On the following Sunday Longo, Pamela Hansen, and Rita Hansen—Pamela's mother and now Mrs. Longo—went to Capaldo's home. Also there, according to Longo, was "Ronnie" (Veronica Hackett, Capaldo's girl friend at the time and now his wife), Ronnie's mother, and the girl who lived downstairs. While in the parlor with Mrs. Hansen and Pamela, Capaldo attempted to convince Longo to join him in stealing some saddles. Longo testified that he told Capaldo that he did not want to do it because he "wanted no trouble on account of my boys." Nevertheless, Capaldo persisted, claiming that "he knew the ropes." At this point the conversation was dropped when Ronnie and her mother entered the room.

Still later in the month, according to Longo, he went to Rita Hansen's house. Rita and Pamela were there and at some point in the morning Capaldo arrived. Capaldo again brought up the subject of stealing saddles. When this conversation ended Capaldo went into the kitchen for coffee with Rita Hansen and Pamela. Longo remained in the parlor but overheard Capaldo telling Mrs. Hansen that he pulled "the bank job."

Some time after this Longo and Capaldo were driving past the Oakville bank when Capaldo looked at the bank and smiled and said to Longo that was how he got the horses and diamond ring and bought the cars and gave his father $800 or $900. He also said, according to Longo, that on the day of the bank robbery he brought the car they got into

2. United States v. Curry, 358 F.2d 904, 919 (2 Cir. 1966).

3. United States v. On Lee, 201 F.2d 722, 723 (2 Cir. 1953), cert. denied, 345 U.S. 936 (1953).

4. See United States v. Flynn, 130 F.Supp. 412, reargument denied, 131 F.Supp. 742 (S.D.N.Y.1955), cited with approval in United States v. Curry, 358 F.2d 904, 918 (2 Cir. 1966).

at the bank up to Ziggy's lot on Old Danunzio Road where they left it and got into one with smooth tires which could not be traced. In fact, a stolen car was found by the police shortly after the robbery in Ziggy's lot which fitted the description given by another witness of the get-away car. Also during this conversation, Capaldo said that one time Ronnie took the gun and the money and rode around town until the police left.

Longo also testified at the trial that the first statement he gave to law enforcement officers concerning the case was in June of 1964 when two F.B.I. agents and Deputy Chief Carlos Palumba of the Watertown Police Department unexpectedly came to his place of employment to interview him.

The discussions concerning saddle stealing are quite significant. As was fully brought out at the trial, Longo was in fact arrested, along with Capaldo, for stealing saddles and the two were tried for the crime in a state court. Longo, however, was the only one convicted. Longo testified at the trial in the instant case that both he and Capaldo had committed the crime and that the outcome of the trial ended their friendship, Longo evidently feeling that Capaldo, after convincing him to commit the crime, left him holding the bag. Despite Longo's testimony that he really was not angry with Capaldo, the jury could easily have concluded that this incident was the reason for Longo's willingness to cooperate with law enforcement agents after they had approached him. On the other hand, it was most reasonable for the jury to refuse to conclude, as the defense argued, that Longo, because of the incident, was trying to get even with Capaldo by framing him. Longo was by no means a glib witness. He did not appear to fabricate answers as he went along for, if he had been, his answers would have been far more complete. Rather he appeared to make a sincere effort to recall the incidents about which he was questioned. He did not contradict himself on the stand nor did his testimony at that time conflict in any material way with statements

given to the F.B.I. on June 18, 1964 and September 13, 1967 or with his testimony before the grand jury on April 11, 1967.

Perhaps the most convincing and most damaging evidence against Capaldo was the testimony of Pamela Hansen, the young girl who is now Longo's stepdaughter. Miss Hansen testified in great detail to the first conversation in March of 1964 between Longo and Capaldo when Capaldo said "I'll never tell", after having been asked about the robbery by Longo. She also testified that on the following Sunday, in Capaldo's parlor, Capaldo had in fact admitted, during his attempt to convince Longo to join him in stealing saddles, that he had robbed the bank. Miss Hansen then described the incident at her mother's house on the following Tuesday. She was in bed when Capaldo first arrived but came into the kitchen when Capaldo and her mother, then Rita Hansen and now Rita Hansen Longo, were there having a cup of coffee. When she entered the room Capaldo was standing by the stove showing her mother a diamond ring which he said he bought for Ronnie for $650. At this point, according to Miss Hansen, her mother asked Capaldo whether he really robbed the Oakville bank, and he said: "Yes, where do you think I got all the money?" Miss Hansen further testified that at some point during the day Capaldo said that "one time the cops were going to search [my] apartment but Ronnie got there before them and got the money and the guns and rode around town for three or four hours."

When questioned about her feelings toward Capaldo after Longo alone was convicted for the saddle theft, Miss Hansen insisted she was not angry at Capaldo although she admitted that her mother and stepfather were. She also stated that although Mr. Longo was sentenced to 6 months in jail for the crime, he was immediately put on probation and therefore actually served no time for the conviction. She further testified that the police came to her to question her about Capaldo and that she did not go

to them. Miss Hansen's testimony was consistent on material points with her statements to law enforcement agents given on June 18, 1964 and September 13, 1967.

Miss Hansen's mother, Rita Hansen Longo, also testified in a detailed and convincing fashion concerning Capaldo's admissions. In describing the conversation in Capaldo's parlor on the Sunday late in March of 1964, she said that Capaldo asked Longo to help him get some saddles and told him "don't worry because I know the ropes—who do you think did the bank job?" According to Mrs. Longo, approximately the same conversation was repeated at her house on the following Tuesday morning after which Capaldo came into the kitchen where she asked him whether he really did the bank job. He answered "Yes", according to Mrs. Longo, and then said "Where do you think I got all the money?" She said he told her he bought two horses, cars and loaned his father some money. She also said he showed her a diamond ring which he said he bought for Ronnie for $650 in New York. Also while at her house that day Capaldo made the statement that when the police went to his apartment on Old Colonial Road, Ronnie had gotten there first and had taken the gun and money and had driven around town for a few hours. Mrs. Longo said that the same afternoon she again asked Capaldo about the robbery and he said he really did do it—"Why do you think all the cops in Waterbury are after me?"

Mrs. Longo admitted that she was a "little mad" at Capaldo when her husband alone was convicted for the saddle theft and had told Capaldo at the time that "his day is going to come, yet." She said, however, that now she has no feeling against Capaldo. She also said she did not call the police or F.B.I. concerning Capaldo. Her testimony was consistent on material points with the statements she gave to law enforcement officers on June 18, 1964 and September 13, 1967 and with her testimony before the grand jury on April 11, 1967.

Defendant Capaldo now attempts to negate all this testimony, which could most reasonably be believed by a jury and which was believed by the jury in this case, with the testimony of a man named Roger James Lubesky. Lubesky, 20 years of age, is currently an inmate at the New Haven State Jail, the same jail in which Capaldo has been incarcerated since his conviction for the bank robbery on October 4, 1967. At the time of his testimony before this Court in the course of the hearing on the instant motion, he was awaiting sentencing on three counts of breaking and entering and two counts of larceny. Lubesky claimed that he knew Robert Longo because they had worked together at the Virjune Manufacturing Company in Waterbury. He testified that some time in June, 1967 he had a conversation with Longo in the shop locker room. Longo mentioned that he had been arrested for stealing horse saddles and for stealing pheasants. Then, according to Lubesky, the subject of the Oakville bank robbery came up. Lubesky testified that Longo "said he knew one of the kids that robbed the bank, and that he told his wife and kid to say—told them to get even with him because he said that Capaldo ratted him out one time for stealing horse—tell the cops, to tell the police that they heard Mr. Capaldo tell them that he robbed the bank." Lubesky confirmed that Longo had said he knew one of the men who robbed the bank. It was only after repeated questioning by defense counsel that Lubesky said that Longo told him he knew one of the men who was arrested for the robbery rather than that he knew one of the men who robbed the bank. Lubesky also testified that they talked about the approaching trial of Capaldo and that Longo told him that the police wanted him to testify against Capaldo but he did not know whether he would do so. According to Lubesky, Longo asked him what he would do and said "he was afraid that if he told the truth, that he was lying, that he would get arrested for perjury, and he would get his wife and kid in trouble too."

Lubesky also testified that he did not know Capaldo at the time of this conversation with Longo and that he only met Capaldo after Capaldo came to the New Haven State Jail upon his conviction for bank robbery. Lubesky also said that it was only after Capaldo was at the jail for about two days that he learned of Capaldo's conviction. After finding this out, Lubesky said he told a fellow prisoner named Ernest Benson about the conversation with Longo and then told Capaldo. The defense did not produce Benson as a witness.

On cross examination, Lubesky admitted that during the course of Capaldo's bank robbery trial, about the last day of September, he had read an account of it in the paper and had read that Longo, his wife, and stepdaughter had testified against Capaldo. After he testified to this he subsequently said he read the account in the paper only after he had signed a statement on October 9, 1967 for defense counsel—a statement which counsel for the defendant has made a part of the moving papers in the instant motion. Lubesky also admitted that the extent of his relationship with Longo was conversations they had with each other at their place of employment. Furthermore, he denied ever having known Capaldo before Capaldo was brought to the New Haven State Jail on October 4, 1967 although both men were incarcerated in that same jail during periods of 1964.

The government, in response to Lubesky's testimony, called Pamela Hansen to the witness stand. She testified, as she did at the trial, that she was not expecting the officers who first came to interview her concerning the Capaldo case and that neither Robert Longo nor her mother told her what to say. On cross examination by defense counsel, she said the family may have twice discussed the fact that Capaldo said he robbed the bank but never discussed what he actually told them. She reiterated that neither Robert Longo nor her mother told her what to testify to before she testified before the jury; nor did Robert Longo tell her what to say to the police.

The government then called Mrs. Rita Hansen Longo who also testified that she was surprised when agents first interviewed her in June, 1964. She further testified that Robert Longo never told her before or after that interview what to tell the agents and that he never told her he was going to frame Capaldo. On cross examination she testified that she did not remember discussing Capaldo's admissions with her family prior to the June, 1964 police interview.

Robert Longo was then called to the witness stand by the government. He also testified that he was surprised when officers first interviewed him in June, 1964 and that prior to that time he had not been in touch with them. He admitted he knew Lubesky from work and that he had talked to him several times at the shop. He further said that he had indeed talked to Lubesky in the shop locker room in June, 1967, and had even mentioned that he and Capaldo had been arrested for stealing saddles. But here the similarity between Longo's version of the conversation and Lubesky's ends. According to Longo, Lubesky then asked him whether Capaldo was kind of big and dark, and when he said yes, Lubesky said he knew him from the New Haven State Jail. Longo said this was the extent of the conversation and that the bank robbery was never discussed. He testified that he never coached, instructed or influenced his wife or child concerning the matter in any way. On cross examination he said he could not remember having discussed what Capaldo had said about the robbery with his family prior to the police interview in June, 1964. Longo also said that his son, who knew Lubesky, had told him when Lubesky came to work at Virjune "to watch out that Lubesky would steal the eyes out of your head." Finally, Longo said that while he and Lubesky had worked on the same machine together six or seven times, it was impossible to talk to each other over the

noise and that they never ate or took coffee breaks together.

Special Agent William Zimmerman of the F.B.I., the agent in charge of the bank robbery investigation, testified that he and two other law enforcement officers first interviewed Robert Longo, Rita Hansen Longo, and Pamela Hansen in June, 1964.[4a] He said that both Mr. and Mrs. Longo were surprised when they arrived and that to his knowledge neither Longo nor any member of his family had gotten in touch with the F.B.I. or any law enforcement agent in connection with the Capaldo case.

Thomas Fiore, a lieutenant detective and member of the Waterbury Police Department for 29 years, testified that Lubesky was a member of the Waterbury community and that Lubesky's reputation in the community for truth and veracity was bad. Albert J. Caputo, a detective and member of the Waterbury Police Department, testified similarly. It was stipulated that if Michael Dumont were called to testify by the defense that he would testify that Robert Longo's reputation for truth and veracity was bad. It was also stipulated that Dumont was Capaldo's roommate during February and March, 1964.

■ Having thus had an opportunity to hear and observe the witnesses who testified at the trial and at the hearing on the instant motion, the Court has the duty of applying the recognized tests in judging credibility. These tests include: the demeanor of the witness while on the stand; any interest the witness might have in the outcome of the case; any bias or prejudice for or against a party; the opportunity of a witness to observe; any reason for the witness to remember or forget; the inherent prob-

ability of the testimony of the witness; the testimony's consistency or lack of consistency; and its corroboration or lack of corroboration with other credible evidence.[5] Doing so, the Court finds the testimony of Roger James Lubesky absolutely incredible to the extent that it is offered in support of defendant's instant motion.

Lubesky's testimony is on its face full of contradictions. For example, he first testified that Longo said he knew one of the men who robbed the bank. Only when he realized that this completely undermined his story did he say that Longo really said he knew one of the men who was arrested for robbing the bank. Another example is Lubesky's initial testimony that he read an account of the trial in a newspaper about September 30, 1967 when the trial was still in progress and then his later testimony that he really read the account after he had given a statement to counsel for the defense.

■ But even absent such inherent contradictions, Lubesky's testimony would not warrant granting the instant motion. Lubesky's testimony really only goes to the credibility of Robert Longo. Even if Longo's testimony were disregarded, the testimony of Rita Hansen Longo and her daughter Pamela Hansen would stand. Mother and daughter have both flatly denied that Robert Longo ever told them what to say or influenced them concerning this case in any way. The Court finds such denial quite credible in light of all the testimony of these two before the Court. Since their testimony was far more detailed than that of Robert Longo, it is inconceivable that he could have been responsible for what they related.

**4a.** Zimmerman testified, signficantly, that these witnesses were interviewed on June 18, 1964 in this order: Rita Hansen Longo, Pamela Hansen, and Robert Longo.

**5.** See Lomartira v. American Automobile Insurance Company, 245 F.Supp. 124, 131 (D.Conn.1965), aff'd, 371 F.2d 550 (2 Cir. 1967); Westchester Fire Insur-

ance Company v. Tantalo, 273 F.Supp. 7 (D.Conn.1967); Rosner v. Modern Maid Packers, Inc., 274 F.Supp. 685 (D. Conn.1967); United States v. Feudale, 271 F.Supp. 115, 119 (D.Conn.1967); Pickett v. Nelseco Navigation Company, 270 F.Supp. 682, 683 (D.Conn.1967); Locke Manufacturing Companies v. United States, 237 F.Supp. 80, 89 (D. Conn.1964).

Just one of many indications of who is telling the truth is the fact that Longo admitted speaking to Lubesky in June, 1967. If Longo were guilty of perjury, he most certainly would have denied speaking with Lubesky at all. Furthermore, it is highly unlikely that Longo, if he had framed Capaldo, would ever confide this fact to a man he hardly knew and about whom he had been warned to watch out because the man "would steal the eyes out of your head."

Another such indication is Lubesky's denial of his being acquainted with Capaldo prior to Capaldo's October 4, 1967 incarceration in the New Haven State Jail which, under the circumstances, seems highly incredible.

There is perhaps little doubt that the outcome of the saddle stealing episode was a factor in causing the Longo family to reveal Capaldo's admissions. This certainly must have been evident to the jury. But in light of all the testimony of these witnesses and in light of their demeanor on the witness stand, the credibility of their testimony is not diminished. The testimony just did not bear any of the earmarks of fabrication which it would otherwise have, and it is certainly relevant to note that Longo did not serve any time in jail because of the saddle stealing conviction.

The Court thus finds that the testimony of Roger Lubesky concerning alleged admissions of perjury by Robert Longo is not only unconvincing but entirely incredible. Accordingly, the Court finds that neither the testimony of Robert Longo, Rita Hansen Longo nor Pamela Hansen was perjured. It is therefore unnecessary for the Court to reach the question of whether, absent the testimony of these three, the jury might have reached a different verdict.[6] Furthermore, even if such testimony were perjured, Capaldo was not taken by surprise when the testimony was given and certainly had every opportunity to meet it; if it was false he certainly knew it was so during the trial. Hence the defendant's motion would merit denial on this additional point.[7]

Even if the mere discovery of new impeaching testimony were sufficient to warrant a new trial, the additional post-trial evidence offered by defendant Capaldo utterly fails to accomplish such impeachment.

Defendant Capaldo's motion for judgment of acquittal notwithstanding the verdict or, in the alternative, for a new trial is, accordingly, hereby denied.

---

6. Cf. United States v. Flynn, 130 F.Supp. 413, 421 (S.D.N.Y.1955).

7. United States v. Flynn, supra note 6, at 421.