Emerson D. FOLK and National Business Forms, Inc., Appellants,

v.

WALLACE BUSINESS FORMS, INC., Successor to Standard Business Forms, Inc., Appellee.

Emerson D. FOLK and National Business Forms, Inc., Appellees,

v.

WALLACE BUSINESS FORMS, INC., Successor to Standard Business Forms, Inc., Appellant.

Nos. 11994, 11995.

United States Court of Appeals Fourth Circuit.

Argued March 8, 1968.

Decided April 16, 1968.

William M. Pate, Atlanta, Ga. (Mitchell, Clarke, Pate & Anderson, Atlanta, Ga., Thomas Ashe Lockhart, and Cansler & Lockhart, Charlotte, N. C., on brief), for appellants in No. 11,994 and appellees in No. 11,995.

Fred B. Helms, Charlotte, N. C., and Henry M. Whitesides, Gastonia, N. C. (Helms, Mulliss, McMillan & Johnston, Charlotte, N. C., on brief), for appellee in No. 11,994 and appellant in No. 11,-995.

Before BRYAN and CRAVEN, Circuit Judges, and MacKENZIE, District Judge.

MacKENZIE, District Judge.

On October 21, 1957, Standard Business Forms, Inc. purchased Emerson D. Folk's interest in that corporation. As part of the consideration for the sale, the usual agreements were executed under which Mr. Folk agreed not to compete in a three state area and not to hire employees of Standard Business Forms, Inc. for a ten year period.

In 1959, a declaratory judgment suit was instituted by Folk and his new company, National Business Forms, Inc. to clarify the contract provisions relative to Folk's not hiring Standard's employees. On August 12, 1959, a consent permanent injunction was entered as follows:

"Now, therefore, it is ordered, adjudged and decreed as follows:

1. That the individual plaintiff, Emerson D. Folk, his heirs, executors, administrators, legal representatives, successors and assigns and the corporate plaintiff, National Business Forms, Inc., its officers, agents, servants, employees, attorneys, successors or assigns and all other persons in active concert or participation with them or either of them be and they are hereby permanently enjoined, inhibited and restrained from, directly or indirectly through any other person, firm or corporation or in any manner, until after December 31, 1967: Attempting to hire, hiring, employing or continuing to employ, without the prior written approval of W. E. Hendricks, any person except Charles B. Brown, as set forth in the agreement of October 21, 1957, who was or has been at any time from October 21, 1954, to October 21, 1957, employed by Standard Business forms, Inc., a corporation with principal offices in Gastonia, North Carolina.

2. It is further ordered that the defendant and its surety be and they are hereby discharged from any bond heretofore posted in this proceeding, and that the plaintiffs be taxed with the costs hereof.

This 12th day of August, 1959.

/s/ Wilson Warlick
Wilson Warlick
District Judge".

Five years later, on October 14, 1964, Standard Business Forms, Inc., under

its new merged title of Wallace Business Forms, Inc., moved for a contempt citation against Emerson D. Folk and his corporation, National Business Forms, Inc., for violating the permanent injunction set forth in the paragraph just above. In brief, the citation charged that Folk and National Business Forms, Inc., either collectively or separately, "* * * employed or caused to be employed in violation of said consent judgment and consent permanent injunction Clyde Walker, Witzel K. Chastain and J. B. Hodgins, all three of whom were employed by [Standard Business Forms, Inc.] at some time during the period between October 21, 1954 and October 21, 1957".

After extensive hearings over a period of three years, on June 16, 1967, Chief Judge Wilson Warlick of the District Court for the Western District of North Carolina found that the injunction had indeed been violated and supplemented that finding by an order filed August 28, 1967, finding civil contempt damages against Folk and National Business Forms, Inc., in favor of Wallace Business Forms, Inc. (formerly Standard Business Forms, Inc.) in the amount of $30,000.00 plus the costs arising from the prosecution of the contempt, and attorneys' fees of $6,000.00.

From the contempt order this appeal was taken by Folk and National Business Forms, Inc.

From that portion of the order fixing damages and attorneys' fees, a cross-appeal was taken by Wallace Business Forms, Inc. (formerly Standard Business Forms, Inc.).

The questions for decision on appeal are:

(1) Whether the finding of the trial court that Folk and National violated the injunction by employing Witzel K. Chastain, Clyde Walker and J. B. Hodgins, is supported by the evidence;

(2) Whether the evidence supports the trial court's finding of injury to Standard or Wallace proximately resulting from the violation of the injunction found by the court;

(3) Whether the evidence authorizes a finding of damages in the amount of $30,000;

(4) Whether the award of attorneys' fees was proper.

We find ample evidence to support the findings of the District Court that Folk and National Business Forms, Inc. violated the injunction; that the damages as found by him proximately flowed from the violation and that the award of attorneys' fees was proper.

It is admitted that Chastain, Walker and Hodgins were employees of Standard Business Forms, Inc. during the period October 21, 1954 to October 21, 1957, and therefore covered by the permanent consent injunction of August 12, 1959, as being persons whose hiring was forbidden to Emerson D. Folk, National Business Forms, and all persons or corporations participating with Folk and National directly or indirectly.

Chastain, Walker and Hodgins left Standard and became employees of Eastern Business Forms, Inc., a corporation discussed by them as early as the fall of 1963, while they were still employed at Standard, and finally incorporated in September, 1964.

As early as February, 1964, while Chastain, Walker and Hodgins were still employed with Standard, Folk and National Business Forms were already aiding and abetting the three in creating Eastern Business Forms, Inc. It was then that Folk and National committed themselves for $35,000.00 for a press for Chastain, Walker and Hodgins, and this at a time when the personal credit of the three Standard employees could not possibly have warranted it. Incidentally, Chastain, a $12,000.00 a year employee of Standard, could make a $3,500.00 down payment in cash to Folk for the press equipment because Chastain "had this money left over from some bonds he had sold in the fall of 1963 to take care of his daughter's wedding and had been carrying around in cash ever since." Note

that the down payment was made to Folk who ordered the press, in National's name, from the manufacturer.

Six months later, in August, 1964, one month before the Eastern Business Forms, Inc. began business, and two or three weeks after Chastain had left Standard, Folk loaned Chastain $40,-000.00, without any security, on a note written in pencil on a piece of scrap paper. According to Chastain, he did not tell Folk what the money was for, nor did Folk ask him. Folk could not remember whether he knew of Chastain's new business venture or not. Chastain, at the time, was out of work and his $9,000.00 home had a $10,000.00 mortgage to Folk already on it. At this point, Folk and National were underwriting Chastain, Walker, Hodgins and Eastern for $89,000.00 consisting of guaranteeing the payment of a press ($35,000.00), a rubber plate machine ($4,000.00), an unrecorded mortgage on Chastain's home ($10,000.00), and an unsecured loan to Chastain ($40,000.00).

At the time of the hiring by Eastern of Chastain, Walker and Hodgins, Folk had provided $50,000.00 (through "loans" to Chastain) of the total subscribed capital of Eastern of $85,000.00. In addition, through his corporate credit guarantee, he had made possible the press, the one major item, and the rubber plate machine, the second of the absolute requirements for Eastern to begin operations.

The trial court was justified in finding such financing indicated a greater interest by Folk and National in Chastain, Walker, Hodgins and Eastern Business Forms, Inc. than just kindnesses extended to an old friend. Indeed, so Folk considered it, when, according to the record, he said:

"Q. Well, you seemed to know who had the controlling interest.

A. Sure, I found out after this trial began. I would have been foolish not to learn the whole set up. At no time could *the money I had in there* get controlling interest of that stock". (emphasis added).

It is not necessary to discuss these "loans" from Folk in any great detail as there is ample evidence to support the District Court's finding of multiple subterfuge. Suffice it to say, Folk's $10,000.00 mortgage on Chastain's $9,000.00 home was most informal. As Folk stated it, " * * * I made a little memorandum out and he and his wife signed it, but it wasn't—I don't even know whether it was—I suppose it was legal, but I didn't take the trouble to put it in legal terms and take it to the courthouse and record it, because I had trust in him".

The $40,000.00 "loan" from Folk to Chastain in August of 1964 was even less formal. It consisted of a pencil written note; Chastain did not remember whether he informed Folk what it was to be used for; and no collateral was offered. This $40,000.00 "loan" drifted in this fashion until there suddenly appeared a most comprehensive and technical security agreement drawn by Folk's attorney, executed October 24, 1964, posting Chastain's Eastern Business Forms, Inc. stock as security. It seems more than just coincidental that this security agreement was quickly produced in the short interim between the notice of October 13, 1964, to question Chastain, Walker and Hodgins and the schedule for those depositions on October 28, 1964.

Through these "loans" and other devices, Folk and National did, in fact, provide Eastern as the employment vehicle which hired Standard employees Chastain, Walker and Hodgins. Through this camouflage they violated the injunction by acting in concert with others. The injunction specifically forbade any such "indirect" action.

Folk and National attorneys focus their entire attack on the term "employee" and its meaning as related to Chastain, Walker and Hodgins. In view of our finding that Folk and National violated the injunction through their indirect manipulations with Eastern Busi-

ness Forms, Inc., it is not necessary to worry with this "employee" semantics.

■■ No one seriously questions the right of the Court to award civil contempt damages which have long been recognized. Parker v. United States, 153 F.2d 66, 163 A.L.R. 379 (1st Cir. 1946); Gompers v. Buck's Stove and Range Co., 221 U.S. 418, 31 S.Ct. 492, 55 L.Ed. 797 (1910); United States v. United Mine Workers, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947); Weston v. John L. Roper Lumber Co., 158 N.C. 270, 73 S.E. 799 (1912). So also as to the right to include attorneys' fees as an element of the award Toledo Scale Co. v. Computing Scale Co., 261 U.S. 399, 43 S.Ct. 458, 67 L.Ed. 719 (1922); Fleischmann Distilling Corp. v. Maier Brewing Co., 386 U.S. 714, 87 S.Ct. 1404, 18 L.Ed. 2d 475 (1967).

■■ The question of the amount of civil contempt damages of $30,000.00 and attorneys' fees of $6,000.00 was clearly within the discretion of the Trial Judge who heard all of the testimony and we are not persuaded that his finding was erroneous.

Accordingly, the finding of the District Court is affirmed.

Affirmed.