Annette **HEYMAN**, Individually, Annette
Heyman, as Executrix of the Estate of
Lazarus S. Heyman, Late of Danbury,
and Prudential Management Company,
a Connecticut corporation, Plaintiffs,

v.

**Robert S. KLINE, Defendant.**

**Civ. No. B–12.**

United States District Court,
D. Connecticut.

June 26, 1970.

See also D.C., 344 F.Supp. 1081; 344
F.Supp. 1110; 344 F.Supp. 1118.

Jon O. Newman, Hartford, Conn., for plaintiffs.

John R. Bush, of MacFarlane, Ferguson, Allison & Kelly, Tampa, Fla., William B. Rush, of Pullman, Comley, Bradley & Reeves, Bridgeport, Conn., and Thomas J. Dolan, of Coles, O'Connell & Dolan, Bridgeport, Conn., for defendant.

## MEMORANDUM OF DECISION AFTER TRIAL

TIMBERS, Chief Judge.

In this diversity action commenced in this Court on February 12, 1970 by the filing of a verified complaint, plaintiffs seek declaratory and injunctive relief plus damages arising out of defendant's alleged breach of his employment contracts with plaintiffs and defendant's various alleged tortious acts which are claimed to have been injurious to plaintiffs. Specifically, plaintiffs seek (i) a declaratory judgment that defendant has no right, title or interest in certain real property in Tampa, Florida; (ii) preliminary and permanent injunctions enjoining defendant from interfering with plaintiff's ownership and development of the Tampa property; (iii) damages; and (iv) other relief, including reasonable expenses incurred by plaintiffs as a result of acts of alleged civil contempt committed by defendant and his counsel in violating this Court's temporary restraining order of February 12, 1970.

Defendant's verified answer filed March 31, 1970 denies the material allegations of the complaint; alleges certain affirmative defenses; and asserts a counterclaim seeking to establish defendant's interest in the Tampa property and claiming damages.

For the reasons stated below, the Court holds that plaintiffs are entitled to the relief sought by them, and that defendant's counterclaim must be dismissed.

## JURISDICTION

Jurisdiction is founded upon diversity of citizenship and requisite jurisdictional amount. 28 U.S.C. § 1332(a) (1) (1964).

Plaintiff Annette Heyman is a Connecticut citizen residing in Danbury; she sues individually and as executrix of the estate of her late husband, Lazarus S. Heyman, who died a resident of Danbury.

Plaintiff Prudential Management Company is a Connecticut corporation with its principal place of business in Danbury.

Defendant Robert S. Kline is a Florida citizen residing in Largo, Florida.

The matter in controversy exceeds $10,000, exclusive of interest and costs.

The Court, in a memorandum of decision filed March 19, 1970,[1] denied defendant's motion to dismiss this action for lack of in personam jurisdiction over defendant, holding that defendant as a Florida resident was amenable to service of process in Florida pursuant to Connecticut's long arm statute, Conn.P.A. No. 744 (Jan. 1969), *formerly* Conn. Gen.Stat. § 52–59a (1958), and that service was properly made on defendant in Florida pursuant to Conn.P.A. No. 635 (Jan. 1969), *formerly* Conn.Gen.Stat. § 52–59a (1958).

## HEARINGS AND RECORD

Pursuant to agreement of the parties, the Court held an eight day consolidated hearing at Bridgeport, beginning April 27, 1970 and concluding May 7, 1970, on plaintiffs' and defendant's applications for preliminary injunctions, plaintiffs' contempt motion and trial on the merits. Rule 65(a) (2), Fed.R.Civ.P.

The record before the Court consists of the pleadings; facts established by stipulation and requests for admissions; answers to interrogatories; some 105 documentary exhibits; depositions read in evidence; and the trial testimony of 25 witnesses.

Counsel for the respective parties have been fully heard in oral argument; and they have submitted helpful briefs, together with proposed findings of fact and conclusions of law.

## FINDINGS OF FACT

After trial and based upon the entire record, the Court makes the following findings of fact.

(A) *Chronological Sequence of Events*

(1) On February 15, 1968, Lazarus Heyman acquired an option (PX–13)[2] to purchase 73 acres of land in Tampa, Florida (the Tampa property). He paid $10,000 for the option which was exercisable within 120 days, i. e. by June 15, 1968.

(2) On March 31, 1968, after preliminary discussions, Kline entered into a one year written employment contract (PX–22; DX–B) with Lazarus Heyman to begin April 15, 1968. By the terms of this contract, Kline was to devote his full time exclusively to Heyman's business in connection with the acquisition and development of commercial and industrial real estate—particularly the leasing thereof—and Kline was to receive (a) a salary of $20,000 per annum, (b) a year end bonus to be determined at the discretion of Heyman on the basis of leases closed during the year, and (c) the right to invest such bonus payments in Heyman's real estate developments, to the extent of 15% of the equity thereof, subject to the agreement of Heyman's co-venturers and provided Kline indicated his intention to so invest at the inception of the deal. Kline was to open a small office in the Tampa area. His first order of business under this employment contract was the development of the Tampa property upon which Heyman recently had acquired an option.

(3) Lazarus Heyman died on May 22, 1968.

(4) His widow, Annette Heyman, was appointed executrix of his estate. She continued the real estate business of Lazarus Heyman.

(5) Lazarus Heyman was survived also by a daughter, Abigail Heyman, and by a son, Samuel J. Heyman.

(6) Samuel J. Heyman, a lawyer and former Assistant United States Attorney, assisted his mother, Annette Heyman, in the conduct of the family real estate business after the death of his father. At all times here pertinent, he acted as agent of his mother; he also was an officer and stockholder of plaintiff Prudential Management Company.

(7) Shortly after the death of Lazarus Heyman, Samuel Heyman, acting on

---

1. Heyman v. Kline, 344 F.Supp. 1081 (D. Conn.1970).

2. Plaintiffs' exhibits will be referred to as PX___; defendant's exhibits as DX___.

behalf of his mother, orally agreed with Kline that the latter's employment contract with Lazarus Heyman would continue, except that Kline would work in Danbury rather than Tampa.

(8) On June 15, 1968, Annette Heyman, as executrix, upon the payment of $5,000, obtained an extension to July 15, 1968 of the option to purchase the Tampa property (PX–14; DX–C); and on July 15, 1968, upon the payment of an additional $5,000, she obtained a further extension to August 15, 1968.

(9) On August 13, 1968, Annette Heyman, individually, exercised the option to purchase the Tampa property upon the payment of an additional $30,000 (PX–6). The closing took place on December 9, 1968. On February 1, 1969, Annette Heyman entered into a lease (PX–8) of the Tampa property to Tampa Mall, Inc., a subsidiary of Edward J. De Bartolo Company, by the terms of which the tenant is required to commence construction of a shopping center on the Tampa property by August 1, 1970.

(10) Between early July and the middle of August 1968, Samuel Heyman and Kline discussed Kline's continued employment by Annette Heyman. The upshot was an understanding, reached just prior to Samuel Heyman's departure on August 15 for two weeks of military reserve duty, that Kline would be given a new one year employment contract; that his new salary would be $30,000 per annum; and that he would have the right to invest to the extent of 15% in the Tampa venture, subject to certain conditions specified below in paragraph 19.

(11) On September 9, 1968, Kline entered into a new one year written employment contract with Annette Heyman for the period from September 1, 1968 to August 31, 1969 (PX–21; DX–G). This contract superceded the earlier contract of March 31, 1968 between Kline and Lazarus Heyman. The new contract provided that Kline would devote his full time exclusively to the Heyman business, including the acquisition, sale, development and management of commercial and industrial real estate; that he would receive a salary of $30,000 per annum, the use of a leased car, plus reimbursement of reasonable, necessary and ordinary business expenses incurred pursuant to his employment; that he would have the right to invest his own money in his employer's real estate ventures, to the extent of 15% of the equity thereof; and that his 15% participation in the Tampa venture was subject to certain conditions specified below in paragraph 19. Kline was to perform his duties under the new contract at the Heyman office in Danbury and was to take up residence in the Danbury area.

(12) On January 17, 1969, Samuel Heyman, acting for his mother, discharged Kline for cause. See paragraphs 23 and 24 below.

(B) *July 16, 1968 Assignment Of Option*

(13) On July 16, 1968, Annette Heyman executed a simple form of assignment of the option agreement (DX–D) with respect to the Tampa property, under the following circumstances.

(a) Prior to July 16, tax counsel had advised the Heymans that the option to purchase the Tampa property should not be exercised by Annette Heyman as executrix of the estate of Lazarus Heyman.

(b) Samuel Heyman accordingly requested Attorney Albert H. Hornig, whose office was in the same building as the Heyman office in Danbury, to prepare a simple form of assignment so that the option would be held, not by the estate, but by four individuals: Annette Heyman, individually (29%), Samuel Heyman (28%), Abigail Heyman (28%), and Kline (15%). The total consideration was recited to be $20,000, payable to the estate within 30 days.

(c) Attorney Hornig prepared the assignment as requested and it was executed by Annette Heyman on July 16.

(d) Only the ribbon copy of the assignment was executed. It was given to Samuel Heyman who placed it in his own files. Neither the original nor a copy of the assignment was ever delivered to Kline or to anyone else.

(e) Thereafter, real estate counsel advised Samuel Heyman that the option to purchase the Tampa property should be exercised by Annette Heyman alone, as she did on August 13, 1968 (PX–6).

(f) At no time did Samuel Heyman or Annette Heyman intend to make the July 16 assignment an effective document; they specifically decided it was not to be used and was not to become effective.

(14) During the latter part of August 1968, while Samuel Heyman was on military reserve duty and away from Danbury, Kline discovered the original assignment of the option, made a Xerox copy of it and sent it to Attorney Rubin H. Marcus, the Heyman real estate counsel in New York City, on August 21 (PX–28B).

(15) On August 23, Attorney Marcus wrote to Kline advising that the option assignment which Kline had sent to Marcus on August 21 should not be used; that this form of assignment would require that all four individuals be named in the deed from the sellers and all four would have to execute the mortgage; and that Annette Heyman as executrix should simply convey the option to herself.

(16) On August 26, Kline replied to Attorney Marcus' letter of August 23, stating, "Please draw up whatever you think would be best in the form you want and send it on to me." (PX–28D).

(17) On September 16, 1969—thirteen months after Annette Heyman individually had exercised the option to purchase the Tampa property (PX–6) and eight months after Kline was discharged by the Heymans for cause—Kline recorded his Xerox copy of the July 16, 1968 assignment of option on the land records of Hillsborough County, Florida.

(C) *Nature Of Kline's 15% Interest In Tampa Property*

(18) Kline's 15% participation interest in the Tampa venture, acknowledged in the employment contract Kline entered into with Annette Heyman on September 9, 1968 (PX–21; DX–G), was subject to certain specific conditions agreed to between Kline and Samuel Heyman, acting for his mother, as the upshot of their discussions during the period from early July to the middle of August 1968. See paragraphs (10) and (11) above.

(19) Specifically, it was orally agreed that, in return for Kline's investment to the extent of 15% in the Tampa venture, Kline would be

(a) entitled to receive 15% of the profits of the venture, including rents and gains in the event of sale;

(b) obliged to contribute 15% of the cost and expenses of the venture;

(c) limited in his right to sell his interest in the Tampa property by being required to give the Heymans the right of first refusal;

(d) precluded from all decision making with respect to the venture; and

(e) committed to have reduced to writing at a future date the nature of his rights with respect to the Tampa property.

(20) After this oral understanding was reached—just before Samuel Heyman departed on August 15 for two weeks of military reserve duty—Kline delivered to the Heyman office in Danbury checks drawn by him as follows:

(a) Check dated July 21, 1968, but deposited August 15, 1968, to the order of Annette Heyman in amount of $3,000, representing Kline's 15% share of the $20,000 paid by the Heymans for acquisition and extension of the option (DX–E).

(b) Check dated August 9, 1968, but deposited September 6, 1968, to the order of Annette Heyman in

amount of $4,500, representing Kline's 15% share of the $30,000 paid by the Heymans to exercise the option (DX–F).

(21) After the closing on December 9, 1968, at which time Annette Heyman paid an additional $22,575.25 to purchase the Tampa property upon which she had exercised the option, Kline delivered to the Heymans a check dated December 23, 1968 in amount of $6,091.62 (DX–I), representing Kline's 15% share of the closing price ($22,575.25) plus the 1968 real estate taxes ($18,035.36), for which he had been billed on December 12, 1968 (DX–H).

(22) On September 11, 1969, Annette Heyman tendered to Kline (PX–5E) her check in amount of $13,591.62 to reimburse him for the total of his 15% share of payments made on account of the Tampa property ($3,000, $4500 and $6,091.-62) while he was in the Heymans' employ. Kline returned the $13,591.62 check to Annette Heyman on September 17 (PX–5G).

(D) *Kline's Breach Of His Employment Contracts*

(23) Kline breached his obligations under his employment contracts with the Heymans in the following material respects.

(a) He deliberately and knowingly submitted fraudulent expense vouchers to his employers, duplicating expenses charged to his former employer, Shoe Corp. of America, duplicating expenses previously reimbursed by the Heymans, and claiming expenses for entertaining people, which expenses either were not incurred or, if incurred, were paid for by the person Kline claimed was his guest.

(b) He failed to perform his work in the best interests of his employers in that he antagonized tenants to the point where many of them refused to have any dealings with him.

(c) He asked a bank officer on one occasion to predate a letter recommending the Heymans to a Florida bank to make it appear that the letter was written prior to the death of Lazarus Heyman.

(d) He inspected the personal files of the Heymans, snooped through their tax returns and other financial information, and expressed to other employees his view that Lazarus Heyman had "put something over" on the Internal Revenue Service; and later, after his discharge, he threatened to report to the Internal Revenue Service his assertions of tax irregularities on the part of the Heymans unless they conveyed to him an interest in the Tampa property.

(e) He held himself out to third parties as a real estate broker, an activity that was not part of the Heymans' business.

(f) He endeavored to perform real estate services for persons other than his employers on at least two occasions.

(g) He accepted from a tenant of his employers clothing at a discount of one-third below the wholesale price; he also solicited this tenant to let him have additional clothing at the same discount or at no charge at all; and he thereafter recommended to his employers that this tenant receive a lease on more favorable terms than other tenants of the same building.

(h) He was insubordinate to his employers in failing to follow their instructions concerning work assignments, dealings with the employers' general contractor and office practices; and he failed to respond to their inquiries concerning business matters.

(i) He deliberately set out to cause employees at the Heymans' Danbury office to resign; and he succeeded with respect to four of them, accomplishing his purpose

by a campaign of personal abuse and overbearing domination.

(j) He repudiated his contractual obligations to his employers and declared himself not bound by them.

(k) He failed to perform his obligations satisfactorily in numerous respects, including the spending of inordinate amounts of time on personal matters and indulging in such practices as using the petty cash fund for his own lunches.

(E) *Kline's Excessive And Fraudulent Expenses*

(24) Kline incurred excessive and fraudulent expenses and submitted fraudulent vouchers, of which the following are illustrative.

(a) He was reimbursed by Lazarus S. Heyman for a trip to Odessa, Texas (February 2–3, 1968) in amount of $84.15 (PX–25). His supporting voucher included $8.50 for motel, $15.49 for car rental, $50.61 for airline ticket, and $5.41 for telephone calls. With the supporting documents was a bill from the Ramada Inn, Odessa, Texas, for a room charge of $8.50 and a charge for telephone calls in amount of $5.41. Also included in these documents was an airline ticket, although the portion of the ticket which indicated that it was purchased with a Shoe Corp. credit card appears to have been blocked out when the Xerox copy of the bill was made.

PX–36 is a Shoe Corp. expense voucher for the week ending February 3, 1968; it indicates that some of the same expenses reimbursed by Lazarus S. Heyman were reimbursed by the Shoe Corp. Kline was reimbursed for the same airline ticket in amount of $50.61. He was reimbursed for his hotel bill for the night of February 2nd in amount of $13.91, which included the same room charge of $8.50 and telephone charge of $5.41

that were billed to Lazarus S. Heyman. A copy of the same Ramada Inn bill was attached to PX–36. This exhibit also indicates that Kline was reimbursed for auto rental in amount of $15.49.

(b) He was reimbursed by Lazarus S. Heyman for expenses incurred for the period February 10 to February 19, 1968 in amount of $235.24 (PX–25). The voucher submitted included a room charge for February 9th at Tampa, Florida in amount of $13.90. PX–35, a Shoe Corp. voucher, indicates that Kline was reimbursed by the Shoe Corp. for a hotel room for the night of February 9th in amount of $13.91. Attached to this voucher is a hotel bill from the Hawaiian Village Motel at Tampa, Florida.

(c) He submitted an expense voucher for the week ending April 26, 1968 in amount of $243.64. This voucher included two airline charges in amounts of $131.25 and $35.70. He later submitted an expense voucher for the week ending May 3, 1968 in amount of $328.54. This voucher included the two airline charges previously reimbursed, together with several other items reimbursed on the previous voucher. In fact, practically the entire $243.64 previously reimbursed was claimed on the May 3rd voucher.

(d) He submitted an expense voucher for the week ending August 25, 1968 in amount of $217.81. This voucher indicates that on August 24th he travelled from Columbus, Ohio, to Pennsylvania; that he stayed overnight in Pennsylvania on the 24th; and that he arrived in Danbury on the 25th. He billed $37.80 for a room in Pennsylvania on the 24th and $33.28 for a room in Danbury on the 25th. He testified that the August 25th charge in amount of $33.28 was for the Pennsylvania motel on the night of August 24th. However, as indi-

cated above, he already had charged for the Pennsylvania motel in amount of $37.80. (Attached to the voucher is a receipt in amount of $18.95 for a Pennsylvania motel for August 24th. Presumably members of his family occupied another room, thereby accounting for the total of $37.80.) PX–25A indicates that plaintiffs paid the Stony Hill Inn and Motel directly for rooms beginning August 25th and ending August 30th, at a daily charge of $33.13.

He submitted a voucher for the period August 19–September 3 in amount of $384.44. This voucher repeats almost verbatim the expenses previously billed for the week ending August 25th, the exception being that no room charge is claimed on this voucher for August 25th. However, a room charge for August 30th in amount of $30.01 appears on this voucher, whereas the bill from the Stony Hill Inn and Motel indicates that plaintiffs paid this room charge directly. In addition, a charge on this voucher in amount of $10.57 for September 3 was disallowed; and, according to the testimony of Samuel Heyman, Kline admitted this was a personal expense.

(e) He billed $6.15 for dinner with "H. Miller" on June 25, 1968. Ham Miller testified by deposition that he had no such dinner with Kline on that date or on any other date. No supporting receipt was submitted for this item.

(f) He billed $25.43 for dinner with Hy Goldfeld on July 31, 1968. Accompanying this voucher was a receipt indicating a charge incurred at the Water Wheel Inn, Ardsley, New York. Goldfeld testified that he did not have dinner with Kline on this date or on any other date; and in fact he had never been to Ardsley, New York.

(g) He billed $29.78 for dinner with Wes and Bill Woodson on September 11, 1968. He submitted a receipt indicating a charge in this amount but dated September 12th instead of September 11th. Wes Woodson testified by deposition that he had dinner with Kline on September 11th, but that he paid for the dinner himself. Woodson's American Express receipt supports this testimony. Woodson testified that this was the only occasion on which he or his cousin, Bill Woodson, had had dinner with Kline.

(h) He charged $8.39 for entertainment for Messrs. Meredith and Hamilton on August 7, 1968. Meredith testified by deposition that he had several drinks with Kline on this date, but that Meredith paid for the charges incurred. Kline did not submit a receipt substantiating this charge.

(i) He charged $4.35 for entertainment for Lee Colber on May 25, 1968. He submitted a Danbury hotel bill which indicated a $4.35 restaurant charge for May 25. Colber testified that he was not entertained by Kline in Danbury, and that the only time Kline might have paid for a meal for Colber was on a trip to Meriden on a later occasion.

(j) He submitted, in his expense voucher for the two weeks ending October 25, 1968, a charge in amount of $6.00 for dinner on October 7, 1968. The item is labeled "Dinner Re Topps". No supporting receipt was submitted. In his deposition, Kline testified that he took Samuel Heyman to dinner on this occasion. After Heyman testified that this was not so, Kline changed his story at the trial to indicate that he had dinner alone.

(k) He submitted a charge of $9.73 for June 11, 1968 for "Entertainment —R. Bush." He also submitted a supporting receipt for a charge at the Herdas Steak House, Clear-

water, Florida, having written the name R. Bush on the receipt. Ruth Bush testified by deposition that she had had dinner with Kline on only one occasion in her life, and that it was not at this restaurant.

(*l*) He submitted a voucher for the period May 21—May 25, 1968. The amount reimbursed in accordance with this voucher, together with other charges for this period billed directly, totalled $277.01. Included was a charge in amount of $10.50 for limousine service for Kline's wife. There was testimony at the trial that Kline and his wife were in Danbury at that time to attend Lazarus Heyman's funeral.

(m) A number of items claimed by Kline for reimbursement were disallowed in part because of his admission to Samuel Heyman that they represented personal expenses. Only $21.00 of the $31.61 claimed for gas for the week ending September 28, 1968 was paid; and only $15.00 of the $22.51 claimed for the week ending October 11, 1968 was paid. In addition, a claim was made by Kline for the week ending December 11, 1968 in amount of $201.30, of which only $116.81 was allowed. The trip covered by this voucher never should have been made in view of Samuel Heyman's instructions to Kline that the trip was to be taken only after Mr. Barnett had seen the DeLand, Florida property. Mr. Barnett's letter (PX–5B) states that he had not seen the property prior to Kline's visit.

(n) In Kline's voucher for the two weeks ending November 29, 1968, he charged $2.50 for entertaining Emanuel Dakis on November 25. Mr. Dakis testified that he met with Kline on this occasion, but that Dakis paid for any expenses incurred. Kline submitted no supporting receipt for this charge.

(F) *Contempt Of This Court's February 12, 1970 Temporary Restraining Order*

(25) On February 12, 1970, upon presentation of plaintiffs' verified complaint and application for a temporary restraining order, Rule 65, Fed.R.Civ.P., this Court issued its temporary restraining order at 4:00 P.M. It was filed at 4:08 P.M.

(26) On February 12, 1970, at 11:30 P.M., personal service of the temporary restraining order and other process was made upon defendant, Robert S. Kline, at his home in Largo, Florida, by a process server, Albert A. Estes, Sr., pursuant to this Court's order.

(27) The temporary restraining order specifically enjoined Kline, his attorneys and others acting in concert with Kline, from initiating any legal proceedings, filing any documents on land records or making any assertions to any financial institutions, Tampa Mall, Inc., or any other persons, in which Kline claimed any right, title or interest in the Tampa property specifically described in the complaint and in the temporary restraining order.

(28) On February 13, 1970, Kline, through his attorney, John R. Bush, Esq., of Tampa, Florida, in direct defiance of the temporary restraining order of this Court and in violation thereof, caused a *lis pendens* to be filed on the land records of Hillsborough County, Florida, applicable to the Tampa property, which was the very same property that this Court's temporary restraining order entered the previous day had enjoined Kline and his attorneys from encumbering.

(29) Attorney Bush, as well as Kline, had seen the temporary restraining order and were aware of all of its provisions *prior* to the filing of the *lis pendens* on February 13, 1970, as well as *prior* to initiating the lawsuit referred to in paragraph (30) below.

**1098**

(30) On either February 13 or 18, 1970, Kline, through Attorney Bush, also in direct defiance of the temporary restraining order of this Court and in violation thereof, initiated a lawsuit against plaintiff, Annette Heyman, by filing a complaint in, and causing a summons to be issued by, the Circuit Court of the Thirteenth Judicial Circuit, Hillsborough County, Florida, alleging that Kline claimed an interest in the Tampa property, which was the very same property that this Court's temporary restraining order of February 12, 1970 had enjoined Kline and his attorneys from claiming an interest in.

(31) Attorney Bush, as well as another of Kline's attorneys, Harvey B. Oshins, Esq., of White Plains, N. Y., both fully aware of the provisions of this Court's temporary restraining order of February 12, 1970, nevertheless advised Kline to take the action referred to in paragraphs (28) and (30) above.

(32) Plaintiffs filed in this Court on February 24, 1970 a motion that Kline, Attorney Bush and Attorney Oshins be adjudged in civil contempt of this Court and that plaintiffs, *inter alia,* be awarded compensatory damages to reimburse them for expenses incurred by them as a result of the acts of civil contempt committed by Kline and his attorneys in violation of this Court's temporary

restraining order of February 12, 1970. Plaintiffs' contempt motion was continued from time to time at defendant's request. An evidentiary hearing thereon was held on April 27, 1970.

(33) The *lis pendens* and the Florida lawsuit, referred to in paragraphs (28) and (30) above, were withdrawn by Kline and his attorneys on March 24, 1970— after they had been pending for approximately five weeks and approximately one month after Attorney Bush conceded he became aware of the amended Connecticut long arm statute which authorized service of process upon a nonresident, as it was made upon Kline in the instant case.

(34) In the meantime, plaintiffs and their counsel incurred certain counsel fees and expenses necessitated by the instant contempt proceedings and the preparation of proceedings to remove to the Florida federal court the Florida state court action referred to in paragraphs (28) and (30) above. I find that the following counsel fees and expenses are fair and reasonable in amount and that the same necessarily were incurred in connection with said proceedings as a direct result of the contempt of this Court's temporary restraining order of February 12, 1970 by Kline and his attorneys:

(a) Counsel fees of plaintiffs' Florida counsel (Messrs. Carlton, Fields, Ward, Emmanuel, Smith & Cutler, of Tampa, Florida) ........................................$1,500.00

(b) Counsel fees of plaintiffs' Connecticut counsel (Messrs. Goldstein & Peck, of Bridgeport, Connecticut) ........ 1,159.00

(c) Expenses of Samuel J. Heyman in traveling to Florida .. 200.00

(d) Expenses of witness Albert A. Estes, Sr., of Seminole, Florida, in traveling to Connecticut .................. 335.57

Total ...........$3,194.57

———◆———

(35) Defendant, Robert S. Kline, and his attorneys, John R. Bush, Esq. and Harvey B. Oshins, Esq., are guilty of civil contempt of this Court.

(36) As a consequence of said contempt, plaintiffs are entitled to recover against said Robert S. Kline, John R. Bush, Esq., and Harvey B. Oshins, Esq.,

the sum of $3,194.57, representing reasonable expenses incurred by plaintiffs as a result of said contempt.

## CONCLUSIONS OF LAW

(1) The Court has jurisdiction over the subject matter and the parties.

(2) The pleadings present a justiciable controversy between the parties.

(3) Defendant's right to invest and participate in the Tampa property was conditioned upon his faithful performance of his contractual employment obligations to plaintiffs.

(4) Defendant breached his contractual employment obligations to plaintiffs in material respects.

(5) Plaintiffs are entitled to a decree that defendant has no right, title or interest in the Tampa property.

(6) The assignment of the option executed by Annette Heyman on July 16, 1968 never was delivered to defendant and never became effective.

(7) Plaintiffs are not obligated to pay defendant any further compensation, commissions or other benefits.

(8) Plaintiffs are entitled to recover reasonable damages from defendant (to be determined as provided at page 1108 below).

(9) Plaintiffs are entitled to preliminary and permanent injunctions.

(10) Plaintiffs are entitled to recover from defendant and his attorneys, John R. Bush, Esq. and Harvey B. Oshins, Esq., the reasonable expenses incurred by plaintiffs as a result of the acts of civil contempt committed by defendant and his attorneys in violating this Court's temporary restraining order of February 12, 1970.

(11) Plaintiffs are entitled to judgment dismissing defendant's counterclaim.

(12) Defendant is not entitled to a temporary restraining order or a preliminary injunction.

## OPINION

### I.

The critical threshold issue is whether Kline's claimed right to invest and participate in the Tampa property was conditioned upon his faithful performance of his contractual employment obligations to plaintiffs. I hold that it clearly was.

Kline's contract with plaintiffs was not a divisible one; plainly it was the intention of the parties and the object of the contract that Kline's right to invest and participate in the Heyman real estate ventures, including the Tampa property, depended for its consideration upon Kline's obligation of faithful performance of his employment engagements.

" 'The divisibility of the contract does not alone depend upon the multiplicity or the separability of the items therein, but upon the intention of the parties and the object of the contract. If it was the intention of the parties to treat the contract as an entire contract, and it appears that their engagements would not have been entered into except upon the clear understanding that the full object of the contract should be performed, it is not a divisible contract. . . .' " 6 Williston, Contracts § 862, at 271 (3d ed. Jaeger, 1962), quoting from Stern v. Sunset Road Oil Co., 47 Cal.App. 334, 340, 190 P. 651 (1920).

The Heymans extended to Kline a right to a 15% participation in the Tampa property only on condition that he would faithfully perform his employment obligations. Kline agreed to perform his employment obligations only on condition that he would have a right to a 15% participation in the Tampa property. The right to invest and participate was a vital and necessary part of the consideration for Kline's promise faithfully to perform employment services. This relationship between the right to invest and the duty to perform employment obligations was a basic part of the written employment contracts of March

31, 1968 and September 9, 1968 and of the interim oral agreement reached between Kline and Samuel Heyman after the death of Lazarus Heyman.

The parties' conceptual "right to invest—duty to perform employment obligations" had its genesis in Kline's written contract with Lazarus Heyman of March 31, 1968 which obligated Kline to perform for one year. Its fifth paragraph provided for a discretionary bonus to be paid "[a]t the end of each year of said employment." The sixth paragraph expressed the intention of Lazarus Heyman to permit Kline to invest "any sums which may become due to you under the terms of the foregoing paragraph." Plainly the intention of the parties at the outset was not that Kline should be granted a right to invest unrelated to his employment obligations; rather, it was specifically intended that he be permitted to invest only those sums he might receive as a bonus after a year of faithful performance. Obviously the failure to perform faithfully would preclude the right to invest.

After the death of Lazarus Heyman on May 22, 1968, discussions between Kline and Samuel Heyman established an interim oral agreement of employment and led to the signing of a second written employment contract. The oral agreement continued in effect the first written employment contract, except that Kline's place of employment was changed from Tampa to Danbury. The discussions ultimately gave more precise content to the nature of the rights Kline would acquire by his 15% investment; and, responding to his demand, it was agreed that he would receive a 50% salary increase, from $20,000 to $30,000 per annum. The oral agreement which emerged from these discussions was reached prior to Samuel Heyman's departure in mid-August for two weeks of military reserve duty.

Kline's second written employment contract, entered into with Annette Heyman on September 9, 1968, refers to Kline's right to invest as being "in ad-

dition to your remuneration." The obvious interpretation of these words, in the context of the entire contract and all that preceded it, is that the right to invest stands, not separate from and unrelated to remuneration, but as something extra—given for precisely the same consideration as remuneration is given, namely, the obligation of faithful performance.

During the period of the second written contract, as well as during the period of the interim oral agreement, the evidence is clear that the parties intended Kline's right to invest and his obligation to perform to be reciprocal and dependent upon each other. The Heymans were not endeavoring to raise capital for their Tampa venture. Their testimony is unequivocal that they never sought partners or investors on any basis for this venture. They were willing to let Kline invest solely because he was an employee from whom they expected a year of faithful service. From their standpoint, he never would have received a right to invest had he not been an employee. From his standpoint, he never would have agreed to perform his employment obligations had he failed to receive a right to invest. Indeed, Kline testified that during the interim period between the written agreements he was not certain whether he would remain in the employ of the Heymans on any basis.

Upon the entire record, I hold that Kline's claimed right to invest and participate in the Tampa property was conditioned upon his faithful performance of his contractual employment obligations to plaintiffs.

## II.

■ Moreover, the record establishes by an overwhelming preponderance of the credible evidence that Kline breached his contractual employment obligations to plaintiffs in numerous material respects.

A large portion of the trial testimony and many documentary exhibits demonstrate Kline's failure faithfully to per-

form his employment obligations. See findings (23) and (24) above. Briefly, his breaches included the following: he submitted fraudulent expense vouchers; he failed to perform work in the best interests of his employers, including antagonizing tenants; he caused other employees to resign; he solicited and accepted a kick-back from a tenant in return for a favorable lease; he failed to work exclusively for his employers, attempting to perform real estate services for others and holding himself out to others as a real estate broker (which he was not); he was guilty of gross insubordination to his employers, refusing to carry out assignments as directed and failing to respond to their inquiries concerning their properties; he repudiated his contract with his employers, declaring it was not worth the paper it was printed on; and, after snooping through his employers' private financial papers and tax returns, he expressed to other employees his belief that Lazarus Heyman had "put something over" on the Internal Revenue Service, and later threatened to report Annette and Samuel Heyman to the tax authorities if they did not convey to him an interest in the Tampa property.

Any one of the foregoing acts or omissions on the part of Kline alone would have justified his discharge; together they compelled it.

Among the well established grounds for discharge of an employee are dishonesty, 3A Corbin, Contracts § 680 (1960); padding expense accounts, Hutchinson v. Washburn, 80 App.Div. 367, 80 N.Y.S. 691, 692 (2nd Dept. 1903); charging personal expenses to employer, Graves v. Kaltenbach & Stephens, Inc., 205 App.Div. 110, 111, 199 N.Y.S. 248, 249 (1st Dept. 1923), aff'd, 237 N.Y. 546, 143 N.E. 737 (1923); making secret examination of employer's records, Allen v. Aylesworth, 58 N.J.Eq. 349, 351–53, 44 A. 178, 179 (1899); accepting gifts from customers, Wade v. Barr Dry Goods Co., 155 Mo.App. 405, 410–12, 134 S.W. 1084, 1086 (1911); doing business on behalf of third parties,

Merrimac Mfg. Co. v. Bibb, 124 Ark. 189, 191–92, 186 S.W. 817 (1916); and generally any conduct adverse to the employer's interests and such as to cause the employer to lose confidence in his employee, 35 Am.Jur. *Master and Servant* §§ 40–49 (1959).

An employer may take into account an employee's entire course of conduct in deciding to discharge him, Gordon v. Dickinson, 100 W.Va. 490, 497–98, 130 S.E. 650, 652–53 (1925); and even if some infractions have been condoned, that is deemed to be on condition that the employee's future conduct will be proper. 35 Am.Jur. *Master and Servant* § 50 (1959).

An employer's motive in discharging an employee is irrelevant. In Re Nagel, 278 Fed. 105, 109 (2 Cir. 1921). And an employer may justify a discharge on the basis of facts learned after the discharge with respect to the employee's misconduct. Bright v. Ganas, 171 Md. 493, 504–05, 189 A. 427, 431–32, 109 A.L.R. 467 (1937); Graves v. Kaltenbach & Stephens, Inc., supra; Hutchinson v. Washburn, supra; Von Heyne v. Tompkins, 89 Minn. 77, 82–83, 93 N.W. 901, 906–07 (1903); Allen v. Aylesworth, supra; 35 Am.Jur. *Master and Servant* § 37 (1959).

I hold that Kline breached his contractual employment obligations to plaintiffs in material respects.

### III.

The Court having held that Kline's claimed right to invest and participate in the Tampa property was conditioned upon his faithful performance of his contractual employment obligations to plaintiffs, and that Kline breached those obligations in material respects, the next inquiry is whether the Court should decree that Kline has become disentitled to claim an interest in the Tampa property. I hold that such a decree should enter.

If Kline had performed faithfully his employment obligations, he would have been entitled to a 15% par-

ticipation in the Tampa property. By his material breach of his employment obligations, he lost that right. Even where interests in real property actually have been conveyed by deed, equitable remedies are available to extinguish the interests thereby created when the grantee fails to perform obligations under a contract of personal service and the entitlement to the property interests initially arose out of the employment agreement. See 5 Corbin, Contracts § 1120 (1964); Caramini v. Tegulias, 121 Conn. 548, 186 A. 482 (1936). The classic example is conveyance of a house in return for the grantee's promise to render personal service to the grantor; upon failure of performance, a court of equity will order reconveyance of the property by way of specific restitution or cancellation of the deed. Caramini v. Tegulias, supra.

This doctrine is not limited to instances where the conveyance of an interest is supported solely by the promise to perform services; it extends as well to situations, such as the instant case, where the promised conveyance is in exchange for both a promise to perform services and a specific cash consideration. An example of this situation is an employee stock option agreement.

■ The employee, as part of his employment contract, receives the right to buy stock at a favorable price. He pays the price and thereafter fails to abide by the terms of his employment contract. Notwithstanding his purchase of stock, he loses the right to the stock upon his material breach of his employment contract. A court of equity will order rescission and restitution of the shares back to the employer, as in Maytåg Co. v. Alward, 253 Iowa 455, 464–68, 112 N.W.2d 654, 658–60, 96 A.L.R.2d 162 (1962), where an employee failed to fulfill a three-year obligation of service after purchase of stock.

■ In the absence of language to the contrary in the contract, an employee benefit will be construed as being supported by the consideration of continuing employment.

"The courts in construing particular provisions of stock-option agreements seek to give effect to the intent of the parties in entering into such arrangements, and recognize that their fundamental purpose is to secure and retain the loyal services of desirable employees, either for a stipulated period of employment or at the employer's pleasure." Annot., 96 A.L.R.2d 176, at 187 (1964).

Specifically, in Shipman v. General Transistor Corp., 22 Misc.2d 632, 635, 198 N.Y.S.2d 852, 855 (Sup.Ct., Queens Co., 1960), aff'd, 12 App.Div.2d 529, 207 N.Y.S.2d 734 (2nd Dept. 1960), the court held that, in addition to an implied covenant of good faith and fair dealing, a covenant of loyalty on the part of an employee must be implied in a stock option agreement.

In Wyles v. Campbell, 77 F.Supp. 343, 347–48 (D.Del.1948), it was held that a stock option issued as additional compensation in connection with an employment contract for a stated term implied an obligation to serve for such term.

■ Where the claim is made that an employee has not performed his contractual obligations, the court will examine the entire contract to determine what was the intended extent of the employee's consideration. Lutzker v. Walter E. Heller & Co., 172 F.Supp. 77 (S.D.N.Y. 1959). And it has been held that two separate documents will be examined to determine whether continued employment was contemplated as consideration for a separately executed stock option agreement. O'Brien v. United Home Life Insurance Co., 147 F.Supp. 761 (E.D.Mich.1957), aff'd, 250 F.2d 483 (6 Cir. 1958).

Finally, it should be noted that the Court's power to decree that Kline is not entitled to claim any interest in the Tampa property does not depend on the nature of the evidence of Kline's claimed interest. That is to say, it matters

not whether Kline's asserted rights in the Tampa property stem from his employment contracts (as plaintiffs say) or from his Xerox copy of the July 16, 1968 assignment of option (as defendant says). In either case, the consideration for whatever rights Kline claims to have acquired in the Tampa property was his promise faithfully to perform his employment obligations. The nature of the relief to be granted of course would vary, depending upon whether Kline's rights flow from the employment contracts or the assignment of option. This becomes moot, however, in view of the Court's holding that the assignment never became effective. See findings (13)–(17) above, and the discussion of the option assignment which follows at pages 1103–04.

The Court holds that, since Kline has breached his contractual employment obligations to plaintiffs in material respects, he no longer is entitled to claim an interest in the Tampa property, and a decree so declaring will enter.

## IV.

The circumstances under which an assignment of the option agreement was executed by Annette Heyman on July 16, 1968 but was never delivered to Kline and specifically never was intended by the Heymans to become effective, are set forth in findings (13)–(17) above.

Whether the assignment ever became effective as a matter of law depends, initially, on the intention of the asserted assignor. 4 Corbin, Contracts § 879 (1951). "Some extrinsic evidence of an intention that the instrument shall be immediately operative is necessary." 3 Corbin, Contracts § 577 (1960, Supp. 1964), addition to note 25. "The most obvious form of assignment is a writing signed by the assignor and delivered to the assignee. . . ." 4 Corbin, Contracts § 879, at 528–29 (1951). And no problem under the parol evidence rule is encountered by showing what the intention of the parties was with respect to the document and whether it ever was intended to become operative or ever in fact became operative. ". . . a written document can not prove its own character . . . Some parol testimony is required to prove the 'execution' of the document—the genuineness of the signature, the delivery as a true offer or acceptance or both, the expression of assent by each party." 3 Corbin, Contracts § 577, at 386 (1960). If parol is permitted to show delivery and assent, obviously it is available to show lack of delivery and lack of assent. For an example of the correct use of parol to show the absence of a contract—the precise facts of this case—namely, signing of a document, non-delivery, and accidental or wrongful acquisition of the document by the party seeking to enforce it, see 3 Corbin, Contracts § 577, at 389, example 2 (1960).[2a]

There is a sharp conflict between the testimony of Annette Heyman and Samuel Heyman, on the one hand, and the testimony of Kline, on the other hand, as to whether the assignment ever was delivered and ever became effective. The Heymans testified unequivocally that it was not delivered to Kline and that they specifically decided it was not

---

**2a.** Counsel for both sides agree that Connecticut law governs all contracts in this case. Under these circumstances, the Court of Appeals for this Circuit recognizes that ". . . where a question of state law must be determined in a diversity case, great weight should be given the determination of a district judge sitting in that state." Lomartira v. American Automobile Insurance Co., 371 F.2d 550, 554 (2 Cir. 1967). I hold that parol evidence clearly was admissible upon the construction of Kline's employment contracts; and likewise to show non-delivery and non-effectiveness of the assignment of July 16, 1968. Rosner v. Modern Maid Packers, Inc., 274 F.2d 685, 688 (D.Conn.1967); Segan Construction Corp. v. Nor-West Builders, Inc., 274 F.Supp. 691, 696 (D.Conn.1967); Choolgian v. Nordstrom, 111 Conn. 572, 150 A. 499 (1930). See generally Gem Corrugated Box Corp. v. National Kraft Container Corp., 427 F.2d 499 (2 Cir. 1970); Schiavone & Sons, Inc. v. Securalloy Co., Inc., 312 F.Supp. 801 (D.Conn.1970).

to be used and was not to become effective. Kline testified that a copy of the assignment was delivered to him a few days after July 16 by Samuel Heyman.

Applying the accepted standards for determining credibility as discussed more fully at pages 1104–05, below, I find Kline's testimony upon this issue to be incredible; and I accept as credible the testimony of Annette and Samuel Heyman. This determination is based primarily upon the demeanor of the respective witnesses while on the stand before me; but it is based also upon the consistency or lack of consistency of the testimony, as well as its corroboration or lack of corroboration, with other credible evidence in the case.

For example, aside from Kline's specific testimony that Samuel Heyman delivered a Xerox copy of the assignment to him shortly after July 16, which I simply do not believe, its veracity is highly questionable in view of other evidence, including (i) the fact that Kline insisted upon receiving signed duplicate *originals* of his two employment contracts and he insisted that they contain conforming inked entries; (ii) the fact that Kline's $3,000 check dated July 21, 1968 (DX–E), which he claims corroborates his recollection that he received a copy of the assignment shortly after July 16, actually was not deposited until August 15 and was *numbered out of sequence* among Kline's cancelled checks for the month of July; and (iii) the fact that the first documentary evidence of Kline's possession of a Xerox copy of the assignment is his letter to Attorney Marcus enclosing a copy of the assignment *on August 21* (PX–28B)— more than a month after he claims Samuel Heyman delivered a copy to him, at a time Heyman was away from Danbury on military reserve duty and at a time another employee (Mary Reynolds) testified Kline was busy making photocopies of a large number of documents in the Heyman office.

Upon the entire record, I hold that the assignment of the option execut-

ed by Annette Heyman on July 16, 1968 never was delivered to Kline and never became effective.

## V.

As is apparent from the findings of fact set forth above at pages 1091–99 and from the preceding sections of this opinion, it has been necessary for the Court to resolve issues of credibility with respect to most of the disputed matters in this case. While this is not a new experience, a brief statement of the standards applied may be appropriate.

The testimony of each of the 25 witnesses who testified during the trial has been weighed according to standards with which counsel on both sides are thoroughly familiar:

> "The Court, in weighing their testimony, applied such recognized tests as: their demeanor while on the stand; any interest they might have in the outcome of the case; any bias or prejudice for or against either party; their opportunity to observe; any reason to remember or forget; the inherent probability of their testimony; its consistency or lack of consistency; and its corroboration or lack of corroboration with other credible evidence. The testimony of the witnesses, moreover, has been weighed in the light of—and indeed has cast light upon—the exhibits. . . ." Locke Manufacturing Companies v. United States, 237 F.Supp. 80, 89 (D.Conn. 1964).

See also United States v. International Telephone & Tel. Corp., 324 F.Supp. 19, 51 (D.Conn.1970); McNellis v. Raymond, 287 F.Supp. 232, 241 (N.D.N.Y.1968), aff'd in part, rev'd in part, 420 F.2d 51 (2 Cir. 1970); United States v. Capaldo, 276 F.Supp. 986, 992–93 (D.Conn.1967), aff'd, 402 F.2d 821 (2 Cir. 1968), cert. denied, 394 U.S. 989 (1969); Lomartira v. American Automobile Insurance Company, 245 F.Supp. 124, 131 (D.Conn. 1965), aff'd, 371 F.2d 550 (2 Cir. 1967); Segan Construction Corp. v. Nor-West Builders, Inc., 274 F.Supp. 691, 696 (D. Conn.1967); Rosner v. Modern Maid

Packers, Inc., 274 F.Supp. 685, 689 (D. Conn.1967); Westchester Fire Insurance Company v. Tantalo, 273 F.Supp. 7, 15–16 (D.Conn.1967); United States v. Feudale, 271 F.Supp. 115, 119 (D. Conn.1967); Pickett v. Nelseco Navigation Company, 270 F.Supp. 682, 683 (D. Conn.1967).

While the testimony of all witnesses has been carefully weighed according to what the Court believes are the accepted standards for determining credibility, it is the testimony chiefly of Samuel Heyman that is challenged by defendant and the testimony of Kline is vigorously disputed by plaintiffs.

Since Kline's testimony is in conflict with that of nearly every other witness who testified in the case and the validity of Kline's position on the essential issues in the case necessarily turns upon his own credibility, brief reference will be made to examples of what I consider demonstrable lack of credibility on his part.

At the time of Kline's very first appearance before this Court, I found it necessary to resolve an issue of credibility against him. In support of his motion to dismiss the action for lack of in personam jurisdiction, Kline filed an affidavit, sworn to February 15, 1970, denying that personal service of process had been made upon him at his home in Largo, Florida, on the night of February 12, 1970, at 11:30 P.M., by Albert A. Estes, Sr., a process server—thus disputing the truth of Estes' sworn return of service of process on file in this Court. Kline's affidavit stated that, at the time of Estes' alleged service of process on him in Largo, he was in Orlando, Florida, approximately 100 miles away. At the hearing before me on March 3, 1970, on Kline's motion to dismiss the action, both Kline and Estes were in the courtroom. Estes testified specifically and was cross examined regarding his personal service upon Kline at his home in Largo on February 12, at 11:30 P.M., including such details as "Mr. Kline had

on a bathrobe and shower shoes or sandals" and ". . . he was holding a large Shepherd dog in one hand, accepted the papers in the other." [3] Although Kline was present in the courtroom throughout this testimony, he did not take the witness stand. I therefore made the following finding in my memorandum of decision of March 19, 1970, denying Kline's motion to dismiss: [4]

> "The Court finds, after an evidentiary hearing, that process was served personally on defendant at his home in Largo, Florida, on the night of February 12, 1970 by Albert A. Estes, Sr. This finding is based upon the Court's determination of the credibility of Mr. Estes whose demeanor the Court had an opportunity to observe while he was on the witness stand at the hearing on March 3, 1970."

At the time of the March 3 hearing, I thought it was unusual that Kline, who had travelled all the way from Florida to Connecticut to be present, should not testify. Evidence subsequently developed why he chose to remain silent.

At his deposition, Kline testified that he arrived in Orlando on February 12 between 6:00 and 6:30 P.M.; and that it required between one hour and one hour and one-half to drive from Tampa to Orlando, thus fixing his departure time from Tampa between 4:30 and 5:30 P.M.

But records of the telephone company established that Kline had placed a call from Tampa at 5:44 P.M. on February 12 to one Eli First at the number 929–8564. The telephone company records also disclosed that, when Kline received the bill covering this period, he called the company to deny all knowledge of making this call, as reflected by the notation "D.A.K." on the bill.

Then when confronted with this evidence which contradicted his sworn testimony that he had left Tampa no later than 5:30 P.M., Kline changed his testimony: he conceded that he may well have made the call (of which he had de-

---

3. Transcript of March 3, 1970, pp. 30, 32.

4. *Supra* note 1, at 1087.

nied all knowledge to the telephone company) and attempted to move up the time of his departure for Orlando so as to reconcile it with the placing of the telephone call to Eli First.

The net effect of all this serves further to confirm my earlier finding that Albert Estes was telling the truth when he testified that he personally served Kline at his home in Largo on the night of February 12; and that Kline swore falsely in his affidavit of February 15 that he was in Orlando at the time.

I also find that Kline testified falsely regarding numerous instances of excessive or fraudulent expense vouchers; and that his false testimony on these matters, in addition to being at variance with the vouchers themselves, was contradicted by the testimony which I find to be credible by the witnesses Ham Miller, Hy Goldfield, Wes Woodson, Rick Meredith, Lee Cobber, Ruth Bush and Manny Dakis. See findings 23(a), 24 (e), (f), (g), (h), (i), (k) and (n) above.

I also find Kline's testimony to be incredible in its conflict with that of numerous other witnesses, including present and former employees of the Heymans regarding Kline's conduct and statements; the witness Stassa regarding Kline's request that he, as a bank officer, predate a letter recommending the Heymans to a Florida bank to make it appear that the letter was written prior to the death of Lazarus Heyman; and the witness Kelman regarding Kline's denial of having asked for and received clothing from a tenant. See findings 23(c), (g) and (i) above.

As indicated at pages 1103–04 above, I find incredible Kline's testimony that Samuel Heyman delivered a copy of the option assignment to him shortly after July 16, 1968; and I accept as credible the testimony of Samuel Heyman to the contrary.

These illustrations are sufficient to demonstrate the overwhelming basis in the record for my rejecting as incredible Kline's testimony on the essential issues in the case which necessarily turn upon his own credibility. And, to the extent that Kline's testimony conflicts in material respects with that of Annette and Samuel Heyman, I accept the testimony of the Heymans as credible and I reject that of Kline as incredible. In this connection, I have carefully weighed and considered the testimony of the Heymans according to the same standards for determining credibility as have been applied to the testimony of all other witnesses in the case. See pages 1104–05 above.

### VI.

 On the basis of findings (25)–(36) above, made after an evidentiary hearing, it is clear that Kline and his attorneys, John R. Bush, Esq. and Harvey B. Oshins, Esq., are in civil contempt of this Court by reason of their violating the temporary restraining order of February 12, 1970.

 Their defense at the hearing on April 27, 1970 appeared to be that the Court lacked jurisdiction. That issue has been resolved against them by the Court's memorandum of decision of March 19, 1970 denying Kline's motion to dismiss.[5] But upon the facts here established, Kline and his attorneys would be in contempt in any event, for contempt of a temporary restraining order may be committed even though the court later is held to lack jurisdiction, so long as its assertion of jurisdiction was to preserve the status quo and to determine its own jurisdiction. United States v. United Mine Workers, 330 U.S. 258, 290–94 (1947) (Vinson, C. J.); Howat v. Kansas, 258 U.S. 181, 189–90 (1922) (Taft, C. J.); United States v. Shipp, 203 U.S. 563, 573 (1906) (Holmes, J.). The Court of Appeals for this Circuit has so construed United Mine Workers:

"In the United Mine Workers case it was held that except in circumstances

5. *Supra* note 1.

of plain usurpation, a United States District Court has the authority to determine its own jurisdiction in a matter before it, and to maintain the *status quo*, as by issuance of a temporary restraining order, pending the determination of that issue. The Supreme Court concluded, therefore, that even should the district court be ultimately found, in such a case, to lack jurisdiction over the parties or the subject matter, it had power to punish violations of its prior restraining order as contempt." United States v. Thompson, 319 F.2d 665, 667 (2 Cir. 1963).

▪▪▪ Where civil contempt has been established, as here, remedial sanctions may be imposed to compensate plaintiffs for the losses sustained. 5 Moore's Federal Practice ¶ 38.33 [1], at 256–58 (2d ed. 1968); Lance v. Plummer, 353 F.2d 585, 592 (5 Cir. 1965); Walling v. Crane, 158 F.2d 80, 83 (5 Cir. 1946). Such remedial sanctions may take the form of an award of civil contempt damages. United States v. United Mine Workers, supra, at 302–05; Folk v. Wallace Business Forms, Inc., 394 F.2d 240, 242, 244 (4 Cir. 1968); Parker v. United States, 153 F.2d 66, 70 (1 Cir. 1946). Attorneys fees and expenses incurred by the party injured as the result of the contempt may be recovered as part of the compensatory award of damages for civil contempt. Folk v. Wallace Business Forms, Inc., supra, at 242, 244; Lance v. Plummer, supra, at 590, 592; Nelson v. Steiner, 279 F.2d 944, 945, 948 (7 Cir. 1960); West Texas Utilities Co. v. N. L. R. B., 206 F.2d 442, 448–49 (D.C. Cir. 1953), cert. denied, 346 U.S. 855 (1953); Textag Co. v. Hayslip, 192 F.2d 435, 437–38 (5 Cir. 1951). And advice of counsel is not a defense to an act of contempt. United States v. Goldfarb, 167 F.2d 735 (2 Cir. 1948); Eustace v. Lynch, 80 F.2d 652, 656 (9 Cir. 1935).

▪▪▪ It should be noted that, while Kline and Attorney Bush were present at the contempt hearing on April 27, 1970, Attorney Oshins was not. Oshins, however, was given notice of the hearing and was specfically directed to be present. He had appeared in this Court on behalf of Kline on two prior occasions, i. e. on February 20 and February 24, 1970. At the time of his appearance on February 20, the following colloquy took place between Judge Blumenfeld and Oshins: [6]

"MR. OSHINS: Counsel for the plaintiff has indicated that in direct opposition to this order the Florida action has been commenced; and this is based upon counsel's determination that jurisdiction of this Court has been obtained; therefore, that that particular action had been commenced.

THE COURT: Oh, I see. He did that on advice of counsel?

MR. OSHINS: He most certainly did.

This is the urgency that I was trying to throw forward to you.

Since you have put it over until Tuesday morning we will evaluate our position and move forward on Tuesday.

THE COURT: Yes.

If you expect that to relieve you of whatever possible contempt your client is in, I would suggest that you research a little more fully the jurisdictional power of the State of Connecticut.

MR. OSHINS: I appreciate your advice."

At the April 27 contempt hearing, Attorney Bush testified that Oshins had brought to Bush's attention the colloquy with Judge Blumenfeld set forth above; that Bush had talked to Oshins specifically regarding the temporary restraining order; and that Bush's conversations with Oshins were primarily for the purpose of firming up the complaint in Kline's Florida lawsuit. I am firmly convinced that Oshins, who deliberately absented himself from the April 27 con-

6. Transcript of February 20, 1970 Hearing Before Honorable M. Joseph Blumenfeld, p. 11.

tempt hearing, was, among Kline's battery of defense counsel, the key figure in advising and acting in direct defiance of this Court's temporary restraining order of February 12, 1970.

The contempt aspect of this case has been especially agonizing to me. I doubt that there is a judge in the federal service more sensitive than I to the responsibilities of making a contempt adjudication, particularly when an attorney is the alleged contemnor. When the acts of contempt demonstrate such a clear contumacious disregard of the authority of the Court as here, however, the duty of the Court is plain.

### VII.

With respect to the remedies to be provided, it follows from the Court's findings of fact, conclusions of law and opinion that plaintiffs are entitled to a declaratory judgment (Order, paragraphs (1) and (2), *infra* at pages 1108–9); preliminary and permanent injunctions (Order, paragraphs (3) and (4), *infra* at page 1109); attorneys fees and expenses incurred as a result of the civil contempt committed by defendant and his attorneys (Order, paragraph (5), *infra* at page 1109); and damages resulting from defendant's breach of his employment obligations to plaintiffs (Order, paragraph (6), *infra* at page 1109).

■ In order properly to determine the damages to which plaintiffs are entitled, the Court is appointing a Special Master to hear and report on that issue. Rule 53, Fed.R.Civ.P. Among the elements of damage which should be determined, but without limitation, are the following: expenses wrongfully charged by Kline to plaintiffs; that portion of his salary and expenses paid by plaintiffs while Kline was not faithfully performing his employment obligations; and damages sustained by plaintiffs as a result of Kline's causing employees to leave and his impairment of business relations with tenants. The Special Master may take such additional evidence on the issue of damages as he considers necessary; and he is requested to include in his report appropriate findings of fact and conclusions of law.

The Court, recognizing the merit of counsel's suggestion, will afford an opportunity for them to be heard on the form of final judgment to be entered herein, including all aspects of the remedies to be provided. To conserve time and expense, counsel will be heard on the form of final judgment simultaneously with the hearing on the Special Master's report (Order, paragraph (10), *infra* at pages 1109).

It also follows from the Court's findings of fact, conclusions of law and opinion that defendant's counterclaim must be dismissed and his motion for a temporary restraining order or preliminary injunction must be denied.

All claims of fact and law raised by all parties have been carefully considered by the Court. In order not unduly to lengthen this memorandum of decision, all claims of fact and law by any party, not specifically adopted herein, have been rejected. Likewise, any motions to strike evidence or any other motions upon which the Court reserved decision at the time of trial, to the extent they are inconsistent with the Court's findings of fact, conclusions of law and opinion, are denied; otherwise, they are dismissed as moot.

### ORDER

ORDERED, ADJUDGED and DECREED that:

(1) Defendant, Robert S. Kline, has no right, title or interest in

 (a) the real property described in Exhibit A attached to the amended complaint;

 (b) the real property described in Exhibit B attached to the amended complaint; or

 (c) the lease dated February 1, 1969 between Annette Heyman, landlord, and Tampa Mall, Inc., tenant.

(2) Plaintiffs are not obligated to pay defendant, Robert S. Kline, any

further compensation, commissions or other benefits.

(3) Defendant, Robert S. Kline, his agents, servants, attorneys, nominees and persons with whom he is in active concert or participation, be, and they hereby are, permanently enjoined from initiating any legal proceedings, filing any documents on land records, or making any assertions to any financial institutions, Tampa Mall, Inc., or others, in which said defendant claims any right, title or interest in the real property and lease referred to in paragraph (1) (a), (b) and (c) of this order.

(4) Defendant, Robert S. Kline, within ten (10) days from the date of this order, shall release and effectively remove from the land records of Hillsborough County, Florida, the copy of the assignment of the option executed by Annette Heyman on July 16, 1968 which said defendant recorded on said land records on or about September 16, 1969.

(5) Plaintiffs shall recover from defendant, Robert S. Kline, and his attorneys, John R. Bush, Esq. and Harvey B. Oshins, Esq., the sum of $3,194.57, representing reasonable expenses incurred by plaintiffs as a result of the acts of civil contempt committed by defendant and his said attorneys in violating this Court's temporary restraining order of February 12, 1970.

(6) Plaintiffs shall recover from defendant, Robert S. Kline, such amount of damages resulting from his breach of his employment obligations to plaintiffs as the Court subsequently shall determine plaintiffs are entitled to, following action by the Court upon the report to be filed within 45 days from the date of this order by Thomas D. Clifford, Esq., who hereby is appointed Special Master, pursuant to Rule 53, Fed.R.Civ.P., to hear and report upon the said issue of damages to be recovered by plaintiffs from defendant; the undersigned Chief Judge of this Court having determined that appointment of a Special Master for the limited purpose stated above is warranted (i) by the difficulty in determining and computing damages in this particular case, and (ii) by the extraordinary backlog of civil and criminal cases awaiting trial in this District which has created exceptional conditions with respect to the administration of the judicial business of this Court.

(7) Defendant's counterclaim asserted herein in all respects is dismissed on the merits.

(8) Defendant's motion for a temporary restraining order or a preliminary injunction is denied.

(9) Costs shall be taxed according to law in favor of plaintiffs and against defendant.

(10) The Clerk of this Court shall enter final judgment in accordance with the foregoing provisions of this order after the Court acts upon the report of the Special Master provided for in paragraph (6) of this order upon the issue of damages to be recovered by plaintiffs from defendant; and after counsel for the respective parties have been afforded an opportunity to be heard on the form of final judgment to be entered herein, which opportunity shall be afforded simultaneously with the hearing on the Special Master's report.[7]

The foregoing constitute the Court's findings of fact and conclusions of law pursuant to Rule 52(a), Fed.R.Civ.P.

---

7. Judgment for plaintiffs subsequently was entered on September 30, 1970 in net amount of $30,605.53, with interest at 6% from the date of judgment. 344 F.Supp. 1110, 1117, n. *.